**FLORIDA KEYS CITIZENS COALITION, INC., Sierra Club, Inc., and Friends of the Everglades, Plaintiffs,**

v.

**UNITED STATES ARMY CORPS OF ENGINEERS, Col. Robert M. Carpenter, District Engineer, in his official capacity, United States Department of Transportation, Norman Mineta, Secretary, in his official capacity, Federal Highway Administration, Mary E. Peters, in her official capacity, Jim St. John, in his official capacity, United States Environmental Protection Agency, Michael O. Leavitt, in his official capacity, James I. Palmer, in his official capacity, United States Fish**

---

and Wildlife Service, Steven A. Williams, in his official capacity, Sam Hamilton, in his official capacity, James J. Slack, in his official capacity, National Oceanic and Atmospheric Administration, William T. Hogarth, in his official capacity, and Dr. Roy E. Crabtree, Defendants, and

Florida Department of Transportation, Defendant–Intervenor.

No. 04–23175–CIV.

United States District Court,
S.D. Florida,
Miami Division.

April 11, 2005.

Mark A. Brown, Tampa, FL, Thomas Snodgrass, and Pamela Tonglao, Washington, DC, for U.S.

## *ORDER*

HUCK, District Judge.

THIS CAUSE came before the Court on March 29, 2005 for a non-jury trial on the merits of the Plaintiffs' Supplemental Complaint seeking declaratory and injunctive relief against the Defendants, who are various federal agencies and agencies' representatives acting in their official capacities,[1] pursuant to the Administrative

---

1. The Defendants are: U.S. Army Corps of Engineers, Col. Robert M. Carpenter, District Engineer, in his official capacity; U.S. Department of Transportation, Norman Mineta, Secretary, in his official capacity; Federal Highway Administration, Mary E. Peters, in her official capacity, Jim St. John, in his offi-

Procedure Act ("APA"). For the reasons discussed below, the Court finds that the Plaintiffs are not entitled to the relief they seek.

## BACKGROUND

On March 22, 2005, this Court was requested to hear Plaintiffs' Motion for Preliminary Injunction on an emergency basis. The following day, March 23, 2005, the Court held a status conference to discuss scheduling and other matters with counsel. At the status conference, the parties advised the Court that they now had available the complete record of all of the pertinent administrative proceedings related to the subject highway project ("Administrative Record"). The parties agreed that this matter could and should be resolved based solely on that Administrative Record, eliminating the need for testimony or other evidence outside that record. The parties also requested that this matter be resolved on an expedited basis. In view of this, and with the parties' agreement, the Court consolidated the preliminary injunction hearing with a non-jury trial on the merits pursuant to Federal Rule of Civil Procedure 65(a). The trial was held on March 29, 2005.

In summary, the Plaintiffs, Florida Keys Citizens Coalition, Inc., Sierra Club, Inc. and Friends of the Everglades, request that this Court enjoin the Defendants from proceeding with a highway improvement project in the Florida Keys ("Project"). Major construction is scheduled to begin April 4, 2005, thus the need for an expedited resolution of Plaintiffs' claims. The Plaintiffs are all not-for-profit environmental groups with members who have interests in the Florida Keys which are the focus of their challenge. Plaintiffs filed their original complaint on December 20, 2004, which was supplemented on March 15, 2005. The Plaintiffs challenge the decision-making processes and ultimate decisions which have led to federal agencies' approval of the Project. Those challenged federal agency decisions include: (1) the Federal Department of Transportation's ("DOT") and the Federal Highway Administration's ("FHWA") decision in 2004, as the lead or action agency, not to prepare, or require the state partner, the Florida Department of Transportation ("FDOT"), to prepare, a second Environmental Impact Statement ("EIS") or a supplement to the 1992 Environmental Impact Statement for the Project, in violation of the National Environmental Policy Act ("NEPA") and attendant federal regulations; (2) the DOT's and the FHWA's decisions not to evaluate, or require the FDOT to properly evaluate, the actual or constructive use of the Everglades National Park in violation of the Federal Department of Transportation Act; (3) the U.S. Army Corps of Engineers' ("Corps") decision to issue a Section 404 Permit in violation of the Clean Water Act; (4) U.S. Fish & Wildlife Service's ("FWS") decision to issue a Biological Opinion in violation of the Endangered Species Act; and (5) the National Oceanic & Atmospheric Administration's National Marine Fisheries Service's ("NMFS") decision to issue a Biological Opinion in violation of the Endangered Species Act. As an interested party, the FDOT was granted leave to intervene in support of the Project.

cial capacity; U.S. Environmental Protection Agency, Michael O. Leavitt, in his official capacity, Stephen L. Johnson, in his official capacity, James I. Palmer, in his official capacity; U.S. Fish and Wildlife Service, Steven A. Williams, in his official capacity, Sam Hamilton, in his official capacity, James J. Slack, in his official capacity; National Oceanic and Atmospheric Administration, William T. Hogarth in his official capacity, and Dr. Roy E. Crabtree. Plaintiffs subsequently dismissed the claims against Defendants U.S. Environmental Protection Agency, Stephen L. Johnson and James I. Palmer.

Based on the Administrative Record, the parties' respective legal memoranda and oral argument at the trial, the Court makes the following findings of facts and conclusions of law.

## JURISDICTION AND VENUE

This Court has jurisdiction over this civil action under 28 U.S.C. § 1331 (federal question); under 5 U.S.C. §§ 702 and 706(1),(2)(A),(C),(D) (Administrative Procedure Act); under 28 U.S.C. § 1361 (action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the Plaintiffs); under 33 U.S.C. § 1365 (citizen suits under the Clean Water Act); under 16 U.S.C. § 1540(g) (citizen suits under the Endangered Species Act); and pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201. Venue is proper in the Southern District of Florida under: (1) 28 U.S.C. § 1391(b) because the actions giving rise to Plaintiffs' claims occur here; (2) 28 U.S.C. § 1391(e) because it is a civil action against an agency and/or officers or employees of an agency of the United States acting in their official capacities; and (3) under 5 U.S.C. § 703.

## APPLICABLE STATUTES AND REGULATIONS

In order to better understand and evaluate the Plaintiffs' claims, a review of the applicable federal statutes and attendant regulations, which set forth the requirements for the challenged decisions, is in order.

### The National Environmental Policy Act

The National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq., is essentially a procedural statute that requires federal agencies to inform themselves of the environmental effects of proposed federal actions. See Sierra Club v. United States Army Corps of Eng'rs, 295 F.3d 1209, 1214 (11th Cir.2002) ("[NEPA] is not a substantive environmental statute which dictates a particular outcome if certain consequences exist."). When an agency proposes a "major [f]ederal action[ ] significantly affecting the quality of the human environment," 42 U.S.C. § 4332(2)(C), NEPA requires preparation of an EIS in which the agency must examine: (1) the impacts of the proposed action; (2) any adverse environmental effects of the action that cannot be avoided; (3) alternatives to the proposed action; (4) the relationship between local, short-term uses of the environment and the maintenance and enhancement of long-term productivity; and (5) any irreversible and irretrievable commitment of resources which would be involved. See 42 U.S.C. § 4332.

If there is a question whether a proposed action satisfies these criteria, an environmental assessment ("EA") may be prepared. An EA is a brief and concise document containing sufficient evidence and analysis for the agency to determine whether to prepare a more extensive EIS or a finding of no significant impact. 40 C.F.R. 1508.9(a)(1); River Rd. Alliance, Inc. v. Corps of Eng'rs of United States Army, 764 F.2d 445, 449 (7th Cir.1985) ("The purpose of an [EA] is to determine whether there is enough likelihood of significant environmental consequences to justify the time and expense of preparing an [EIS]."). An EA must include only "brief discussions of the need for the proposal, of alternatives as required by section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." 40 C.F.R. § 1508.9(b). A third option is available for certain federal actions that have been determined, because of their very nature and past experience, not to have, individually or cumulatively, a significant effect on the human environment. 40 C.F.R. §§ 1501.4(a), 1508.4. Such actions are considered "categorically excluded" from

the requirement of either an EA or EIS review.

### Section 4(f) of the Department of Transportation Act

The Federal Department of Transportation Act ("FDTA"), 49 U.S.C. § 303 (commonly known as "Section 4(f)"), provides, in pertinent part, that the Secretary of Transportation may approve a transportation project requiring the use of publicly-owned park lands or a publicly-owned site of national, state, or local significance only if: (1) there is no prudent and feasible alternative to using that land; and (2) the proposed program or project includes all possible planning to minimize harm resulting from the use. Once it is determined that a protected resource will be actually or constructively "used" by a project, subsection 4(f)(1) requires the FHWA to determine whether there is any feasible and prudent alternative to using that resource. If no feasible and prudent alternative is available, the FHWA must find pursuant to 4(f)(2) that the plans for the project minimize the harm to the protected resource.

### The Clean Water Act

The Clean Water Act ("CWA"), 33 U.S.C. § 1251 *et seq.*, prohibits the discharge of pollutants, including dredged spoil, into waters of the United States, except in compliance with various sections of the CWA, including Section 404. *See* 33 U.S.C. § 1311(a). "Waters of the United States" is defined by regulation to include wetlands. 33 C.F.R. § 328.3(a), (b). Section 404(a) authorizes the Secretary of the Army ("Secretary"), acting through the Corps, to issue permits for the discharge of dredged or fill material into waters of the United States ("Section 404 Permit"). *See* 33 U.S.C. § 1344(a). Section 404(b) provides that, in reviewing each permit application, the Secretary must apply guidelines developed by the Environmental Protection Agency ("EPA") in conjunction

with the Secretary. 33 U.S.C. § 1344(b). The guidelines developed pursuant to Section 404(b) ("404 guidelines") are published at 40 C.F.R. § 230.1 *et seq.* If the Corps finds that the permit application complies with the 404 guidelines, the Corps must issue the permit "unless the district engineer determines that it would be contrary to the public interest." 33 C.F.R. § 320.4(a)(1). The Corps' "public interest review" evaluates "the probable impacts, including cumulative impacts, of the proposed activity and its intended use on the public interest." *Id.* The Corps must then balance "benefits which reasonably may be expected to accrue from the proposal" against the proposal's "reasonably foreseeable detriments." *Id.* Among the factors to be considered by the Corps in its public interest review are:

> conservation, economics, aesthetics, general environmental concerns, wetlands, historic properties, fish and wildlife values, flood hazards, floodplain values, land use, navigation, shore erosion and accretion, recreation, water supply and conservation, water quality, energy needs, safety, food and fiber production, mineral needs, considerations of property ownership and, in general, the needs and welfare of the people.

*Id.* The regulations that govern the Corps' issuance of a Section 404 Permit require the Corps to consider whether there are "practicable" alternatives to a proposed discharge of dredged or fill material that would have less adverse impact on the aquatic ecosystem. *See* 40 C.F.R. § 230.10(a). "An alternative is practicable if it is available and capable of being done after taking into consideration costs, existing technology, and logistics in light of overall project purposes." 40 C.F.R. § 230.10(a)(2).

### The Endangered Species Act

The Endangered Species Act ("ESA"), 16 U.S.C. § 1531 et seq., provides "a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species. ..." 16 U.S.C. § 1531(b). Section 7(a)(2) of the ESA provides that federal agencies must ensure that any action authorized, funded, or carried out by such agency is not likely to "jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary ... to be critical." 16 U.S.C. § 1536(a)(2). "Jeopardize the continued existence" means "engag[ing] in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02. Critical habitat includes "the specific areas within the geographical area occupied by the species ... on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection...." 16 U.S.C. § 1532(5)(A).

The ESA requires the action agency to consult with the FWS and/or the NMFS whenever a federal action "may affect" an endangered or threatened species. 50 C.F.R. § 402.14(a). Section 7 and its implementing regulations set out detailed consultation procedures designed to provide action agencies with expert advice to determine the biological impacts of their proposed activities. 16 U.S.C. § 1536(b); 50 C.F.R. § 402.01 et seq. "Formal consultation" is described at length at 50 C.F.R. § 402.14. Formal consultation cul-

minates in the issuance of a "biological opinion" by the FWS or the NMFS, which advises the action agency whether jeopardy is likely to occur for any listed species and, if so, whether "reasonable and prudent alternatives" exist to avoid a jeopardy situation. 50 C.F.R. § 402.14(h)(3). The ESA's implementing regulations also recognize the use of "informal consultation" to assist an action agency in determining whether and when further consultation is necessary. Informal consultation "includes all discussions, correspondence, etc., between the Service and the Federal agency or the designated non-Federal representative prior to formal consultation, if required." 50 C.F.R. § 402.02.

If the federal action agency determines, with written concurrence of the FWS or the NMFS, that the action "is not likely to adversely affect listed species or critical habitat, the consultation process is terminated, and no further action is necessary." 50 C.F.R. § 402.13. See also 50 C.F.R. § 402.14(b)(1) (action agency need not initiate formal consultation if it determines, after informal consultation, with written concurrence of the FWS or the NMFS, that proposed action is not likely to adversely affect listed species or critical habitat). In general, the FWS has authority over terrestrial and freshwater species, including the manatee, and the NMFS has authority over marine species, including the short tooth sawfish and sea turtles. See, e.g., Northwest Res. Info. Ctr. v. Nat'l Marine Fisheries Serv., 56 F.3d 1060, 1065 (9th Cir.1995) (discussing the division of responsibility for listed species).

### STANDARD OF REVIEW

The parties agree that the challenged agency actions should be reviewed under the arbitrary and capricious standard. Nevertheless, a brief review of that standard and how it has been applied under

the APA in other environmental claim cases is instructive.

### Administrative Procedure Act

 Under the APA, the appropriate standard for judicial review is whether the actions of a federal agency were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The scope of judicial review under the arbitrary and capricious standard is narrow, and the court is not to substitute its judgment for that of the agency. *Motor Vehicle Mfrs. · Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). In effect, the court reviewing APA claims against an agency "sits as an appellate tribunal, not as a court authorized to determine in a trial-type proceeding whether [the agency's action] was factually flawed." *Marshall County Health Care Auth. v. Shalala*, 988 F.2d 1221, 1225 (D.C.Cir.1993). In an APA case, the court "is not required to resolve any facts in a review of an administrative proceeding. Certainly there may be issues of fact before the administrative agency. However, the function of the court is to determine whether as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Occidental Eng'g Co. v. Immigration and Naturalization Serv.*, 753 F.2d 766, 769 (9th Cir.1985), not to conduct its own investigation and substitute its own judgment for the administrative agency's decision. *Preserve Endangered Areas of Cobb's History, Inc. ("PEACH") v. United States Army Corps of Eng'rs*, 87 F.3d 1242, 1246 (11th Cir.1996).

 Consequently, the agency action should be upheld if the agency has "considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Baltimore Gas & Elec. v. Natural Res. Def. Council*, 462 U.S. 87, 105, 103 S.Ct. 2246, 76

L.Ed.2d 437 (1983). The Court is not empowered to substitute.its own judgment for that of the agency. *Motor Vehicle Mfrs.*, 463 U.S. at 43, 103 S.Ct. 2856. *See also Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) (overruled on other grounds by *Califano v. Sanders*, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977)). The court's well-reasoned observation in *Florida Wildlife Federation v. Goldschmidt* is particularly informative here:

NEPA, while establishing significant substantive goals for the nation, imposes upon agencies duties that are essentially procedural. It was designed to insure a fully-informed and well-considered decision but not necessarily a decision this or any other Court would have made had we been members of the decision-making unit of the agency. Nor does NEPA require an agency to elevate environmental concerns over other legitimate and appropriate considerations.

In evaluating the adequacy of environmental impact statements, the Courts have consistently enforced the "hard look" requirement tempered by a practical "rule of reason." An EIS is required to furnish only such information as appears to be reasonably necessary under the circumstances for evaluation of the project rather than to be so all-encompassing in scope that the task of preparing it would become either fruitless or well nigh impossible. Applying the rule of reason, the Court's task is to determine whether the EIS was compiled in objective good faith and whether the resulting statement would permit a decisionmaker to fully consider and balance the environmental factors.

506 F.Supp. 350, 375 (S.D.Fla.1981) (citations omitted).

 This review of an agency's action is necessarily based on the record present-

ed by the agency as the basis for its decision. While the court defers to the expertise of the agency, and may not substitute its judgment for that of the agency, the court must limit its review to the record at the time the agency acted, and may not consider subsequent matters. *Fla. Pow. & Light Co. v. Lorion,* 470 U.S. 729, 743–44, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985). *See also Volpe,* 401 U.S. at 414, 91 S.Ct. 814. The court "must judge the propriety of [the agency's determination] solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action." *I.C.C. v. Bhd. of Locomotive Eng'rs,* 482 U.S. 270, 290, 107 S.Ct. 2360, 96 L.Ed.2d 222 (1987) (quoting *SEC v. Chenery Corp.,* 332 U.S. 194, 196, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947)).

■ In fulfilling APA review, courts defer to the agency's construction of the statutory scheme it administers and to the agency's special expertise. *See Chevron U.S.A., Inc. v. Natural Res. Def. Council,* 467 U.S. 837, 842–45, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *Envtl. Coalition of Broward County, Inc. v. Myers,* 831 F.2d 984, 986 (11th Cir.1987); *Baltimore Gas,* 462 U.S. at 103, 103 S.Ct. 2246. Not surprisingly, particular deference is accorded to the informed discretion of the responsible federal agencies where issues of science, technical expertise or complex environmental statutes are involved. *Marsh v. Oregon Natural Res. Council,* 490 U.S. 360, 377, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989); *Envtl. Coalition of Broward County,* 831 F.2d at 986. "When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Marsh,* 490 U.S. at 378, 109 S.Ct. 1851. This is because "government agencies—and not the federal courts—are the entities NEPA entrusts with weighing evidence and reaching factual conclusions." *Spiller v. White,* 352 F.3d 235, 243 (5th Cir.2003).

### *Standard for Permanent Injunction*

■ As indicated above, the parties have consented to forego a preliminary injunction hearing and proceed to a final trial on Plaintiffs' request for a permanent injunction. An injunction to preserve the status quo pending preparation of an EIS may be appropriate where there has been a violation of NEPA. *See Envtl. Def. Fund v. Marsh,* 651 F.2d 983, 1005–06 (5th Cir. 1981). Such an injunction serves two beneficial purposes. First, it furthers the aims of NEPA that the relevant decisionmakers and the public have the opportunity to choose among alternatives before resources are committed and a decision is made. Second, it provides "the agency with an incentive to comply with NEPA in as rapid and thorough a manner as is reasonably possible." *Id.* at 1005–06.

■ The standard for issuance of a permanent injunction is very similar to the standard for issuance of a preliminary injunction. *Sierra Club v. United States Army Corps of Eng'rs,* 935 F.Supp. 1556, 1571 (S.D.Ala.1996). Of course, "a plaintiff seeking a permanent injunction must show actual success on the merits, rather than a mere likelihood of success on the merits." *Id.* (citing *Amoco Prod. Co. v. Village of Gambell, AK,* 480 U.S. 531, 546 n. 12, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987)). The four elements for granting a permanent injunction are: 1) irreparable harm; 2) success on the merits; 3) a balancing of the competing claims of injury to the parties; and 4) consideration of the public interest. *Sony Music Entm't, Inc. v. Global Arts Prods.,* 45 F.Supp.2d 1345, 1347 (S.D.Fla.1999).

■ In an APA environmental case, as here, the Plaintiffs must show that Defendants have violated the applicable statutory and/or regulatory authority, that there will be a continuing irreparable injury to the Plaintiffs in the absence of an injunction, and the lack of an adequate remedy at law. *Newman v. State of Alabama,* 683 F.2d 1312, 1319 (11th Cir.1982). The element of "continuing irreparable injury" describes the quality or severity of the harm necessary to trigger equitable intervention while the test for "inadequate remedy at law" considers the possibilities of alternative relief, however serious the initial injury. *Siegel v. LePore,* 234 F.3d 1163, 1213 (11th Cir.2000) (quoting *Lewis v. S.S. Baune,* 534 F.2d 1115, 1124 (5th Cir.1976)). Plaintiffs, of course, have the initial burden of showing that they will succeed on the merits. This element is the most important element, and if Plaintiffs fail in that regard, an injunction will not be entered. *See Johnson & Johnson Vision Care, Inc. v. Contacts, Inc.,* 299 F.3d 1242, 1247 (11th Cir.2002) ("If the movant is unable to establish a likelihood of success on the merits, a court need not consider the remaining conditions prerequisite to injunctive relief."). With these standards in mind, the Court has now considered each of the Plaintiffs' claims to determine whether Plaintiffs have carried their burden of proof justifying enjoining this proposed Project.[2]

## FINDINGS OF FACT [3]

### A. The NEPA Claims.

This Project involves the long evolving highway improvement project proposed along a 20.6 mile stretch of highway US–1 running from Abaco Road on Key Largo at the southern terminus in Monroe County, Florida, to Card Sound Road just south of Florida City at the northern terminus in Miami–Dade County, Florida. Approximately 6.4 miles of the Project are located in Monroe County while the majority of it is located in Miami–Dade County. The segment of US–1 along the Project corridor is currently a two-lane road with two four-lane undivided passing zones, each approximately one mile in length.

On June 29, 1988, the FDOT initiated the Project pursuant to a "Project Development and Environmental Study." The study included 47 meetings and one public hearing among governmental agencies and concerned citizen groups. On March 27, 1992, after publication of a draft EIS and public comment, the FHWA and the FDOT, in cooperation with the United States Coast Guard, issued a Final Environmental Impact Statement ("FEIS"). The FEIS examined three alternate roadway corridors, five roadway designs (four of which were examined as viable options), several options for replacing the obsolete bascule bridge (drawbridge) over Jewfish Creek (including a high-level, fixed span bridge, a replacement bascule bridge, and a tunnel), and a no build option. Several alternative typical roadway sections and no build alternatives were evaluated. Several alignment alternatives were evaluated in the 1992 FEIS. Several replacement options for the Jewfish Creek Bridge and Lake Surprise Causeway were evaluated in the FEIS and Final Engineering Report. Three different four-lane alternatives were evaluated ranging from an undivided median option to a 20–foot median option. Five distinct three-lane alterna-

---

2. Because, as discussed below, the Plaintiffs have not prevailed on the merits as to any of their claims, the Court need not, and therefore, does not, discuss the other three elements.

3. The vast majority of these facts are taken from the parties' Joint Statement of Facts Not in Dispute. The remainder are taken from the Court's review of the Administrative Record.

tives with medians ranging from 4 to 20 feet wide were evaluated.

A cost-benefit analysis of the Jewfish Creek Bridge alternatives was performed in the Preliminary Engineering Report for the Project and summarized in the FEIS. Accommodation of growth in the Florida Keys was identified in the FEIS as one of the Project's important purposes. Other Project purposes identified included safety, navigation, emergency evacuation, system linkage, traffic service, and consistency with transportation plans. The FEIS' preferred and recommended alternative, titled Alternative C–East, consisted of a four-lane divided roadway, with 12–foot travel lanes, a paved 22–foot median divided by a concrete "Jersey" barrier, 10–foot paved inside and outside shoulders, together with a high-level, fixed span bridge over Jewfish Creek to replace the existing bascule bridge.

Highway safety needs are a primary factor in the Defendants' and the FDOT's decision that the improvements were required along this segment of US–1. The original automobile crash study reflected in the FEIS included data for years 1982 through 1986. This data revealed that the crash frequency for the Monroe County portion of this segment exceeded the Florida statewide average for similar fatalities, while the Miami–Dade portion did not. However, the data revealed that most of the crash fatalities (approximately 75%) occurred in the Miami–Dade County portion. The FDOT's 2003 Reevaluation's[4] updated data for the years 1995 through 2001 revealed that the crash frequency over the entire 20.6 mile segment again exceeded the statewide average with approximately the same Monroe versus Miami–Dade County breakdown. From 1997 through 2001 there were 18 fatal crashes resulting in 29 fatalities and 38 injuries. The data showed that the majority of the crashes were head-on collisions resulting from drivers' failed passing attempts or drivers running off the travel lanes onto the shoulders, and then over-correcting into the opposing lane of traffic. There were a total of 363 injury related crashes during this period, resulting in 832 injured occupants. In addition, the Reevaluation established that a large portion of the crashes along the Monroe County portion, being mostly rear-end collisions, were attributed to the Jewfish Creek bascule bridge, which, according to the FDOT was just one of the major sources of safety problems along this highway segment.

In June 1992, after distributing the FEIS for agency and public input, the FHWA gave approval to proceed with the four-lane divided roadway design as originally recommended. In May, 1994, the federal, state, and local agencies approved the permits required for the completion of the upfront wetlands mitigation projects proposed by the FDOT in connection with the four-lane Project. In June, 1994, the FDOT began the permitting process for the roadway improvements as approved under the 1992 FEIS. In the course of permitting the originally designed Project, and in response to requests from the public and the Monroe County Board of Commissioners, the FDOT downsized the Project and its related permit applications to a three-lane configuration—one southbound and two northbound lanes—with three four-lane passing zones. These changes reduced the wetlands impacts of the Project from 164.2 acres to 149.07 acres.

In October 1995, the South Florida Water Management District ("SFWMD") recommended the issuance of wetlands and

---

**4.** "Florida Department of Transportation SR–5/US–1 SOUTH Project Reevaluation" dated December 2003 and discussed below.

surface water management permits to the FDOT for the three-lane Project. Citizens advocacy groups, including Plaintiff Florida Keys Citizens' Coalition, objected to the issuance of the permits pursuant to the State Administrative Procedures Act. After 24 days of hearing testimony from 41 witnesses and three public hearings, the administrative law judge approved the issuance of the wetlands and surface water management permits subject to the conditions proposed in the SFWMD staff reports and certain additional conditions based upon the evidence presented at the hearing. On June 11, 1997, SFWMD issued the permits.

After the issuance of those permits, the FDOT became involved in extensive interagency consultation and study related to the issuance of a wetlands Section 404 Permit from the Corps under the CWA. This interagency consultation and study included efforts to formulate a methodology for analyzing the cumulative and secondary impacts resulting from the three-lane Project and other future highway projects. These efforts continued over several more years and resulted in the issuance of a final report in 1999, entitled "Guidelines to Address Secondary and Cumulative Impacts in the Planning and Project Development Process" (the "Guidelines"). Secondary impacts are those that, though outside the Project footprint, are closely linked and causally related to the Project. In other words, if not for the Project, the secondary impact would not occur. Following completion of the administrative hearing for the previously permitted three-lane Project, the administrative law judge issued a Recommended Order that recognized certain temporary and permanent secondary impacts related to the Project. This Recommended Order was adopted as the SFWMD's Final Order authorizing the issuance of the permits for the three-lane Project.

Additional Project analysis, environmental review, and permitting discussions occurred over the ensuing years following the issuance of the Guidelines, ultimately culminating in the FDOT's release of its "SR–5/US–1 SOUTH Project Reevaluation, From Key Largo to Florida City" in December, 2003 (the "Reevaluation"). The Reevaluation eliminated "accommodation of growth" as one of the Project's purposes and focused upon improvements associated with a revised and reduced list of needs: safety, emergency evacuation, navigation, and consistency with transportation plans. The new Project proposed under the Reevaluation consisted of a two-lane, rather than a four-lane or three-lane, roadway during normal operating conditions, with a ten-foot shoulder (only six feet paved) adjacent to the southbound lane and a twelve-foot shoulder (only ten feet paved) adjacent to the northbound lane. ("Two Lane Safety Project" or "2LSP"). The supporting structure of the paved portion of these shoulders is considerably thinner and less substantial than that of the traffic lanes and thus is not designed for heavy vehicular traffic. However, the northbound shoulder can be temporarily used as an additional traffic lane for emergencies.

The Two Lane Safety Project also provides for the replacement of an existing bascule bridge with a high-level, fixed span bridge over Jewfish Creek that will connect to a low-level bridge over Lake Surprise. The structure of the replacement bridge is essentially the same as that contemplated in the originally designed Project and recommended in the FEIS, albeit with two rather than four traffic lanes. All of the improvements to be constructed under the Two Lane Safety Project will be located entirely within the existing right-of-way and entirely within the footprint of the previously approved four-lane version of the Project. The Two Lane Safety Project represents a significant reduction

in the typical roadway section of the four-lane alternative and also occurs within essentially the same alignment.[5] From an environmental impact standpoint, the currently preferred 2LSP alternative is a scaled down version of the four-lane alternative approved in the FEIS.

As a result of the scaling down from the original four-lane version of the Project to the 2LSP, the estimated wetlands losses have been further reduced from 164.20 acres to 103.9 acres (83.9 acres of which are permanent and 20 acres of which are temporary). The existing US–1 roadway does not contain a surface water management system or water quality treatment facilities. Consequently, untreated stormwater runoff from the paved roadway surface currently sheetflows to adjacent wetlands and tidal waters. The 2LSP contains a surface water management system and water quality treatment facilities to reduce the threats posed by contaminated stormwater runoff and by erosion.

The Reevaluation also analyzed whether a supplement to the FEIS was required for the roadway portion of the 2LSP in light of the scaling down of the Project since its initial approval. The Reevaluation's supplementation analysis concluded: "Particularly given the specific language in the FHWA regulations regarding the targeting of a SEIS [supplemented EIS] to greater environmental impacts, as well as the information on primary and secondary impacts provided by the State proceedings as discussed in this Reevaluation, it does not appear that construction of a smaller project [the 2LSP] in essentially the same location, with the same or greater mitigation and environmental enhancements, should warrant a SEIS." The Reevaluation

also included an analysis of the secondary and cumulative impacts projected to result from the Two Lane Safety Project, including any projected growth related impacts. This analysis included, among other findings, the finding that the "Project will not act as an impetus to further construction, either in the immediate project footprint area or anywhere within the project's potential Area of Influence." The Reevaluation also analyzed the 2LSP's potential impacts on any lands protected by Section 4(f) of the FDTA. Based on this analysis, which included the determination that the 2LSP would not utilize any property from the Everglades National Park, the Reevaluation determined Section 4(f) does not apply.

In addition to the 2LSP's extensive wetlands mitigation to compensate for wetlands losses resulting from construction, and the stormwater runoff treatment/retention facilities, the 2LSP includes other new features that will enhance the environment. These environmental enhancements include: (1) numerous improvements designed to restore hydrologic flows across the US–1 corridor, including the construction of 25 equalizing pipe culverts and three bridges south of Canal C–111, the removal of the Lake Surprise Causeway, and the construction of a new 140–foot Spreader Canal Bridge between Canal C–111 and Florida City, as specifically requested by the Corps in connection with the Comprehensive Everglades Restoration Program; and (2) wildlife protection improvements, including the construction of 16 large box culverts to assist endangered crocodiles and manatees crossing the Project corridor between Key Largo and Canal C–111, fencing to direct wildlife

---

5. A diagram of a typical section of the roadway of the 2LSP and a typical section with the new bridge, which reflect the profiles of the roadway and bridge, is attached to this Order as Exhibit A. A diagram of the contrasts among typical sections of the four-lane alternative, the three-lane alternative and the 2LSP is attached as Exhibit B.

to the designated crossings rather than onto the roadway, four crossings between Canal C–111 and Florida City for endangered panthers and other wildlife (with directive fencing), and the erection of wildlife fencing along the entire west side of the Project corridor and along the east side north of the C–111 canal to prevent road crossings by wildlife.

The FHWA approved the bridge replacement portion of the 2LSP ("Bridge Replacement Project") over Jewfish Creek and Lake Surprise under NEPA by finding that it presented no impacts not known and scrutinized by the FEIS. The FHWA approved the remainder of the 2LSP, consisting primarily of roadway safety improvements ("Road Safety Improvements"), pursuant to a categorical exclusion under NEPA. Specifically, the FHWA found that the Road Safety Improvements are the type of safety improvements that are generally considered to be "categorically excluded" from detailed environmental review under NEPA, "such as shoulders for emergency use and bridge replacements and attendant environmental mitigation," which do not increase traffic capacity. In this regard, the FHWA concluded:

> We find that roadway reconstruction projects that do not increase capacity, but provide safety improvements and replace bridges, such as the bridge over the C–111 canal, are normally categorically excluded from detailed NEPA study. Such is the case with the Two Plus design for this US–1 project. In addition, most mitigation for impacts anticipated when the design concept was four lanes in the 1992 FEIS and ROD have been completed. Other mitigation concepts envisioned earlier for the four-lane concept, such as to restore hydrology and minimize vehicle/wildlife conflicts using appropriate culvert design as wildlife crossings, will be part of the Two Plus design. Thus, we find that the Two

> Plus roadway design will have no significant adverse impacts, and is therefore properly categorically excluded under FHWA regulation.

> . . . . .

> Our approvals are only for the Two Plus design concept. Any different design will require another NEPA evaluation.

> . . . . .

> To reach these findings the Florida Division staff have engaged in extensive coordination and discussion with the FHWA Legal Counsel and FDOT staff, including General Counsel. We have determined it is in the public interest to make these findings now and advance the needed safety and structures work at the earliest convenience and opportunity of the FDOT.

The FHWA's approval of the 2LSP (or "Two Plus design") was "given under the condition that Florida DOT will continue to operate the roadway and bridge portions of this project as a two-lane facility except in emergency events."

## B. The CWA Claims.

In 1994, the FDOT applied to the Corps for authorization under Section 404 of the CWA for a permit to fill approximately 149 acres of wetlands in connection with the construction of the original four-lane highway Project. In 1995, pursuant to a permit granted by the Corps in 1993, the FDOT restored and enhanced 385.22 acres of wetlands at four sites as compensatory mitigation ("upfront mitigation") for future adverse wetland impacts that would occur in connection with the originally proposed four-lane Project. Subsequently, the Corps' expressed concerns that the four-lane Project "would result in significant degradation and adverse cumulative impacts." This prompted the FDOT to withdraw its permit application on September 24, 1997. On July 23, 2003, the FDOT

submitted another application for a Section 404 Permit that would authorize discharges of dredged and fill material into 105.7 acres of wetlands in connection with the now downsized 2LSP.

On December 2, 2003, the Corps issued a public notice to interested parties inviting comments regarding the FDOT's permit application. The Corps received and considered numerous written comments from government agencies, organizations, and individuals. In its January 16, 2004 letter, the EPA commented on the FDOT's new permit application, suggesting that the FDOT consider reducing the size of certain access ramps and service roads and alternative locations for an emergency turnaround area. The EPA also sought additional information to justify the need for a six-foot median on each side of the center barrier. On February 16, 2004, the FDOT responded in writing to the concerns raised in the EPA's letter. The FDOT stated that further reductions in wetland impact could be obtained only by compromising the safety of the highway. On May 5, 2004, the Corps informed the EPA that it was approaching a final decision on the permit application and invited the EPA to submit any additional comments on the application within 15 days. The EPA offered no further comments. In the FWS' January 13, 2004 letter, it informed the Corps that "the applicant's mitigation proposal is adequate to compensate for the project's impacts to wetlands and seagrasses."

Plaintiff, Florida Keys Citizens Coalition, commented in writing on the proposed permit, urging the Corps to consider a roadway median alternative known as the Cape Code Berm Design ("Cape Cod Alternative"). The Cape Cod Alternative refers to an interim safety improvement that was used along a two-lane road to Cape Cod, Massachusetts. It consists of a six-foot median with a three-foot raised asphalt berm supporting flexible delineator posts. Florida Keys Citizens Coalition suggested that use of the Cape Cod Alternative could potentially reduce the extent of wetland impacts. In response to this suggestion, the Corps asked the FDOT to consider the Cape Cod Alternative. Upon its review, the FDOT concluded that the Cape Cod Alternative did not fulfill the safety objectives of the 2LSP because the Cape Cod Alternative is intended to be an interim, not permanent, safety improvement. Further, because the Cape Cod Alternative consists of an asphalt hump rather than a fixed median barrier, it would not prevent head-on collisions and could potentially launch fast moving vehicles into oncoming traffic. Based on the FDOT's review of this alternative, the Corps concluded that the Cape Cod Alternative was not a practicable alternative to the 2LSP because "the safety standards and needs identified for the US–1 South improvement are clearly not met by the 'Cape Cod Alternative.'" The Corps itself considered two additional alternatives to the proposed 2LSP: the no action alternative and the Card Sound Road alternative. Neither was a practicable alternative because neither could fulfill the safety needs related to US–1.

On March 10, 2004, the Corps held a public meeting to discuss the FDOT's permit application and obtain additional comments. The Corps' review of the 2LSP encompassed "the entire project corridor, as well as surrounding navigable waters where construction equipment will be staged and will operate from." After reviewing the entire Project, the Corps requested that the FDOT consider whether the additional modifications to the Two Lane Safety Project could further reduce the impact to wetlands. On April 22, 2004, the FDOT provided to the Corps a revised plan for an intersection that further re-

duced wetland impacts from 105.9 acres to 103.9 acres.

As indicated above, the relevant stretch of US–1 presently lacks any system for treating stormwater runoff from the affected roadway. As a result, stormwater is discharged directly from the roadway into the adjacent wetlands ecosystem. The proposed Project includes a stormwater management system which, in the Corps' review, "is expected to enhance wetland functions along the length of the project by improving water quality and reducing erosional effects." The stormwater treatment system for the 2LSP exceeds the minimum standard under applicable design requirements. The Corps concluded that the 2LSP would lead to cleaner water in the US–1 corridor: "Ecosystem functions will be improved by providing water quality treatment to storm water runoff before it enters the surrounding wetland habitat and adjacent surface waters." In its review, the Corps also considered the potential direct, secondary, and cumulative impacts of the 2LSP. The Corps specifically considered the potential for induced growth as a result of the revised Project. After considering the record before it, the Corps concluded that the proposed two-lane road would not induce growth in light of the specific growth management commitments by the relevant local land use authorities. With regard to minimizing incidents of powerboat propellor scarring, a potential secondary impact to seagrass beds traceable to recreational water use, the Corps recognized that this impact was "related to the volume of use of the Keys as a recreation area" and that the Florida Keys National Marine Sanctuary regulations "substantially reduce such impacts...."

On August 17, 2004, after completing its review of the 2LSP, the Corps granted the FDOT a Section 404 Permit upon finding that "[t]he project as proposed with mini-mization efforts and mitigation ... is the least damaging practicable alternative." In connection with its issuance of the permit, the Corps also prepared an EA under NEPA. The EA concluded with a "finding of no significant impact." This finding was based on a review of the 1992 FEIS, the 2003 Reevaluation, and the Corps' own administrative record. As it explained, "The Corps has determined that with the Re-evaluation Report and all other supporting documentation that has been provided, a Supplemental Environmental Impact Statement is not required (indirect effects were included in our review)." The Corps found that the FDOT adequately addressed the concerns identified by government agencies and other commenters.

The Section 404 Permit, which authorizes the FDOT to discharge dredge and fill material onto adjacent wetlands, is subject to 29 special conditions. The permit authorizes the FDOT to fill 103.9 acres of wetlands, subject to the condition that the FDOT provide 427.11 acres of mitigation to compensate for the impacts of its discharges. The permit:

> acknowledges that as partial mitigation for the wetland impacts the permittee has performed upfront mitigation authorized by DA permit number 199302368 and incorporated herein by reference. The upfront mitigation includes a total of 385.22 acres of wetland creation, enhancement and/or restoration provided at the Harrison Tract within the Crocodile Lake National Wildlife Refuge, the C–109 Canal, the Roadside Spoil, and the C–111 East Canal mitigation sites.

As a further condition, the FDOT must create, enhance and/or restore 49.26 acres of wetlands at on-site and off-site locations as specified in the permit. This mitigation is to be performed concurrently with the Project construction. The permit acknowl-

edges that the FDOT will minimize impacts to wetlands during construction by restricting water-based construction work associated with the Jewfish Creek Bridge to a designated corridor in order to protect aquatic resources, including seagrass beds. Another condition is designed to minimize impacts by requiring the FDOT to perform the removal of the Lake Surprise Causeway from upland areas to minimize the disturbance to aquatic resources. The conditions also call for the FDOT to monitor the barge corridor for any loss or damage to seagrass beds, and, if substantial adverse impacts to seagrass beds occur, the FDOT is to submit to the Corps a separate plan for mitigating such impacts. Other conditions require the FDOT to perform additional mitigation activities to compensate for the unavoidable impacts that are not offset by the upfront mitigation work performed in 1995. The permit also mandates the preparation of a "contingency mitigation plan" outlining procedures to be followed if the contemplated mitigation proves to be less successful than anticipated. The Corps' Section 404 Permit further requires the FDOT to "conduct pre-construction and post-construction seagrass monitoring within and adjacent to the designated barge corridor to quantify potential loss or damage to seagrass beds." These "post construction surveys [ ] will be used to determine any adverse impacts not anticipated as a result of the project." In addition to mitigating for anticipated impacts, the FDOT is required to perform one additional acre of seagrass mitigation to offset unanticipated seagrass impacts in Lake Surprise.

Seagrass impacts anticipated in this Project account for 7.3 acres of the total 103.9 acres of wetlands that will be impacted. The Corps appropriately assessed the sufficiency of mitigation for impacts to submerged habitats in this case based upon acreage ratios. Based on the extent of seagrass mitigation required, the FDOT

identified sites where the mitigation could be accomplished. It noted that while the Boca Chica Mitigation Site lies outside the Project boundaries, this site is within the Florida Keys National Marine Sanctuary and, therefore, within the same geographic area. Nevertheless, both the EPA and the NMFS, in their comments to the Corps, specifically inquired about the availability of mitigation areas closer to the Project site. The FDOT responded directly to these inquiries, explaining that it had conducted a thorough search for sites closer to the Project, but none "would provide the necessary mitigation acreage to offset impacts to seagrasses." According to the FDOT, the primary problem was that "[m]ost of the potential sites were small-scale restoration areas located on privately owned property." The Boca Chica Mitigation Site, by contrast, was a "larger, regionally significant seagrass restoration sites located on publicly owned lands," able to accommodate the 20.25 acres of seagrass mitigation needed for the Project. Thus, the FDOT concluded: "The Boca Chica Seagrass Mitigation Project, although 100 miles away from the [Project], is the only large-scale seagrass restoration site available on public lands within the Florida Keys that will meet the seagrass mitigation needs of the Project."

The Corps' decision to grant the Section 404 Permit rests, in part, on its conclusion that the issuance of the permit was not contrary to the public interest. The justifications in support of the Corps' decision to issue the permit are set forth in a 70–page Statement of Findings/EA dated August 13, 2004. The Corps documented its consideration of the relevant public interest factors in that statement. With regard to the public interest in navigation, the Corps determined that: "Navigation will not be adversely impacted by the Project. The design of Jewfish Creek Bridge maintains the vertical and horizontal clearances

over the navigable portion of Jewfish Creek." Jewfish Creek is part of the Intracoastal Waterway, which affords continuous, protected passage for more than 1,243 miles between Norfolk, Virginia and Key West, Florida. The toll free channel is used by commercial light-draft vessels and tows unable to navigate long stretches in the open ocean, and by pleasure craft. Many small boat and recreational facilities are found along the waterway. Jewfish Creek connects Barnes Sound, with depths of 7 to 10 feet along the channel, to Blackwater Sound, with depths of 7 to 9 feet. Depths along Jewfish Creek vary from 8 to 12 feet. Only shallow draft pleasure and commercial vessels are capable of using the Jewfish Creek channel. The Corps further noted in the record that "large sailing vessels must use Hawk's Channel (oceanside) because the Intra–Coastal Waterway, which includes Jewfish Creek, has a relatively shallow controlling depth....This will continue to be true even if a 65 foot clearance bridge were built."

## C. The ESA Claims.

In 1991, the FDOT completed an Endangered Species Biological Assessment addressing impacts of the original four-lane version of the Project. The FDOT compiled an updated Biological Assessment in December 2003, noting that the Project had been minimized in scope, upfront mitigation had been completed, and design modifications had been included to benefit potentially affected endangered species. Based in part on information included in the FDOT's 2003 Biological Assessment and in accordance with Section 7 of the ESA, the Corps pursued consultations with the FWS and the NMFS to further ascertain potential Project impacts on endangered species. In its February 12, 2004 letter, the FWS concurred with the Corps' determination that the Project is "not likely to adversely affect"

the endangered American crocodile, the endangered wood stork, the endangered Everglade snail kite, the endangered Key Largo woodrat, the endangered Key Largo cotton mouse, the threatened bald eagle, the endangered Cape Sable seaside sparrow, the threatened eastern indigo snake, and the endangered Schaus swallowtail butterfly. Among the proposed mitigation measures employed to avoid vehicle-related crocodile mortality, box culverts will be built to enable crocodiles to pass under the roadway, while new fencing will prevent the animals from entering the roadway. On February 20, 2004 the FWS issued its Biological Opinion concluding that the Project "is not likely to jeopardize the continued existence of the manatee and is not likely to adversely modify critical habitat." The FWS' determination with respect to the manatee was based, in part, on the FWS' analysis of the Project's potential adverse impacts due to any change in watercraft use in the area. The FWS observed, "This proposed project will not provide increased watercraft access in the area. The propose [sic] removal of the Lake Surprise Causeway, and the removal and reconstruction of the bridges over Lake Surprise and Jewfish Creek are not expected to change patterns of watercraft use in the project area." In assessing the potential adverse effects of the 2LSP on the manatee, the FWS was aware that the removal of the existing US–1 Lake Surprise Causeway would restore historic navigational and hydrologic connectivity between eastern and western Lake Surprise. It noted that:

> Another proposed design change in the project will affect navigation in Lake Surprise.... Small boats and personal water craft [sic] will be able to pass back and forth under the low-level portion of the new Jewfish Creek/Lake Surprise Bridge after the Lake Surprise

Causeway has been removed to an elevation of –2.0 feet NGVD.

Nevertheless, the FWS opined that the Project will not change patterns of watercraft use in the project area because operation of watercraft in both the eastern and western portion of Lake Surprise is part of the existing "environmental baseline," noting that "[m]anatees are known to occur within Jewfish Creek and Lake Surprise, and powerboats are known to operate in these areas." The environmental baseline also incorporates existing speed zones and other manatee protection measures. For example, the FWS noted that "Lake Surprise east of the existing causeway has been designated as 'no wake' by the Florida Keys National Marine Sanctuary." In its Biological Opinion, the FWS opined that based on its analysis:

> It does not appear that the rate of watercraft-related manatee mortality is increasing significantly in this subset of the action area. In addition, the proposed project is not expected to change watercraft use patterns or increase watercraft traffic in the action area. The majority of boat traffic will still occur within the AIW and boaters will still be required to observe the "no wake" zone within 100 feet of the new bridge structure over Jewfish Creek. Consequently, it is our view that there are no indirect effects associated with construction of the proposed project.

In the summary conclusion of its opinion, the FWS stated:

> After reviewing the current status of the manatee, the environmental baseline for

the action area, the effects of the proposed action, and the cumulative effects, it is the Service's biological opinion that the action, as proposed, is not likely to jeopardize the continued existence of the manatee and is not likely to adversely modify critical habitat. Our conclusion is based on the fact that this project will not increase watercraft access nor change watercraft use patterns in the area.

On August 6, 2004, the NMFS issued its letter concurring with the Corps' determination that the Project is not likely to adversely affect protected sea turtles or the smalltooth sawfish. The NMFS noted that direct impacts on the sawfish (*e.g.*, injury or death from contact with excavation equipment/piles) are unlikely because sawfish are mobile and can avoid the area during construction. Moreover, the NMFS observed that commercial and recreational catches of smalltooth sawfish are very rare, as detailed by the NMFS in the Federal Register notice listing the species as endangered. The NMFS also noted that "[v]essel traffic is restricted within the project area. A no-access buffer zone and an idle speed zone exists within the project area for manatees and the American crocodile,"[6] and that "existing speed zones will provide additional protection for sea turtles that may enter the area."

As part of its analysis, the NMFS considered the beneficial effects of the Project's mitigation program in assessing the extent of any potential adverse impacts on species. Specifically, the NMFS, in its

---

**6.** The Florida Keys National Marine Sanctuary ("FKNMS"), in conjunction with the FWS, created 27 Wildlife Management Areas that are outlined in the FKNMS 1996 Final Management Plan/Environmental Impact Statement. The eastern half of the lake is included in the Crocodile Lake and Eastern Lake Surprise Wildlife Management Areas (# 21 and # 27 respectively). Both management areas have specific restrictions in place for the protection of the endangered American crocodile and West Indian manatee. The Crocodile Lake Wildlife Management Area has a 100–foot wide no-access buffer zone, by motorized vessels, along the shoreline between March 1 and October 1. The Eastern Lake Surprise Wildlife Management Area has an idle speed only/no wake zone east of US–1.

letter to the Corps, notes that while 33.7 acres of mangrove habitat will be lost as a result of the Project, 82 acres of mangrove habitat in the action area have been restored prior to the beginning of construction, and also that "[a]n additional 5.2 acres of manatee foraging habitat will be created. Furthermore, the proposed causeway removal is expected to improve water quality in Lake Surprise and benefit the manatee by improving existing foraging habitat."

> In summary, the NMFS concluded that: Based on your description of the proposed activity and your commitment to protect federally-listed species, we concur with your determination that this project may affect but is not likely to adversely affect federally-listed species or designated critical habitat under NOAA Fisheries' purview. We believe that the requirements of Section 7 of the ESA have been satisfied and no further consultation is required.

### ANALYSIS AND CONCLUSIONS OF LAW

#### A. The NEPA Claims Against the FHWA.

 Plaintiffs first challenge the FHWA's utilization of a "categorical exclusion" instead of preparing a supplemental EIS to evaluate the potential environmental impacts of the Road Safety Improvements portion of the Two Lane Safety Project. As discussed above, NEPA requires an action agency to consider the environmental impacts of any "major federal action significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). This consideration may take the form of an EIS (or a supplemental EIS), an EA or a categorical exclusion. The FHWA approved the Road Safety Improvements contained within the 2LSP under NEPA by finding the improvements to be "categorically excluded" from the class

of actions for which an EIS or EA is required. Thus, the Court must determine whether the FHWA's use of a categorical exclusion provides the appropriate level of environmental review for this portion of the Project. In order to do so, a review of the pertinent regulatory guidelines for categorical exclusions is necessary. These guidelines provide that in appropriate cases of environment review neither an EIS nor an EA is required. *See* 23 C.F.R. § 771.115. The Council on Environmental Quality's ("CEQ") NEPA regulations authorize the use of exclusions for those categories of actions "which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency in implementation of these regulations." 40 C.F.R. § 1508.4. Pursuant to CEQ regulations, each federal agency is charged with developing criteria to determine the appropriate level of environmental types of actions. 40 C.F.R. § 1507.3(b)(2). *See also* 23 C.F.R. § 771.115 (FHWA regulation describing three classes of environmental review— EIS, EA, or CE [categorical exclusion], each requiring a different level of NEPA documentation).

These regulations further direct that action agencies establish procedures and criteria for determining whether their proposed actions require an EA or an EIS or whether the actions fall into categories which, by their nature, do not require either an EA or an EIS. 40 C.F.R. §§ 1500.4(p), 1501.4, 1508.4. In accordance with this authority, the FHWA promulgated its own NEPA regulations, which provide that the FHWA may use categorical exclusions for:

> [A]ctions which meet the definition contained in 40 C.F.R. 1508.4, and, based on past experience with similar actions, do not involve significant environmental im-

pacts. They are actions which: do not induce significant impacts to planned growth or land use for the area; do not require the relocation of significant numbers of people; do not have a significant impact on any natural, cultural, recreational, historic or other resource; do not involve significant air, noise, or water quality impacts; do not have significant impacts on travel patterns; or do not otherwise, either individually or cumulatively, have any significant environmental impacts.

23 C.F.R. § 771.117(a).

The FHWA regulations specify two categories of actions that may be categorically excluded from detailed NEPA review. *See* 23 C.F.R. § 771.115(b). The first category consists of a list of twenty different actions that are deemed as a matter of course to meet the general requirements of 40 C.F.R. § 1508.4 without any further administrative approvals or NEPA documentation. Examples of this class of actions are the installation of bicycle and pedestrian lanes, paths, and facilities, the installation of noise barriers and the installation of fencing where no substantial land acquisition or traffic disruption will occur. *See* 23 C.F.R. § 771.117(c)(3), (6), (8).

The second category is comprised of additional actions that may be designated as categorical exclusions after receiving administrative review and approval. Such administrative approval requires the submission of documentation demonstrating that: (1) the general requirements of 40 C.F.R. § 1508.4 and 23 C.F.R. § 771.117(a), discussed above, are satisfied; and (2) significant environmental effects will not result from the proposed action. The FHWA regulations provide a non-exclusive list of the types of actions that may qualify under this second category, the documented categorical exclusion category, including: (1) "[m]odernization of a highway by resurfacing, restoration, rehabilitation, reconstruction, adding shoulders, or adding auxiliary lanes (e.g., parking, weaving, turning, climbing);" (2) "[h]ighway safety or traffic operations improvement projects including the installation of ramp metering control devices and lighting;" and (3) "[b]ridge rehabilitation, reconstruction or replacement." 23 C.F.R. § 771.117(d)(1), (2), (3). It is this second type of categorical exclusion that the FHWA used, for the most part, in approving the Road Safety Improvements portion of the 2LSP.

 As with judicial review of other NEPA actions under the APA, the standard of review for determining whether an agency's reliance on a categorical exclusion was proper is the "arbitrary and capricious" standard. *See Nat'l Trust For Historic Pres. v. Dole,* 828 F.2d 776, 781 (D.C.Cir.1987); *City of Alexandria v. Fed. Highway Admin.,* 756 F.2d 1014, 1020 (4th Cir.1985). Deference is particularly appropriate where an agency is interpreting its own regulations in applying a categorical exclusion. *See City of Alexandria,* 756 F.2d at 1020. The Eleventh Circuit Court of Appeals has further indicated that a short, contemporaneous explanatory statement that the agency is invoking a categorical exclusion is normally all that is required. The purpose of the statement is to inform the reviewing court that before approval of the action, the agency did, in fact, consider whether the categorical exclusion applied and determined that it applied to the action to be undertaken. *See Wilderness Watch v. Mainella,* 375 F.3d 1085, 1095 (11th Cir.2004) ("Documentation of reliance on a categorical exclusion need not be detailed or lengthy. It need only be long enough to indicate to a reviewing court that the agency indeed considered whether or not a categorical exclusion applied and concluded that it did.... In most instances, a short statement that a

categorical exclusion has been invoked will suffice to assure a reviewing court that environmental effects have been considered."). However, resorting to the exclusion as a post hac rationalization for the challenged action is insufficient. *Id.* A categorical exclusion may be used even in environmentally sensitive areas, so long as the applicable criteria and documentation are satisfied. *See Krichbaum v. United States Forest Serv.,* 17 F.Supp.2d 549, 558 (W.D.Va.1998) (upholding reliance on categorical exclusion, even though project area included municipal watershed). *See also Southwest Ctr. for Biological Diversity v. United States Forest Serv.,* 100 F.3d 1443, 1450 (9th Cir.1996) (agency may invoke categorical exclusion where endangered or threatened species are present if agency determines project will not negatively impact on species).

In *City of Alexandria,* the court deferred to the FHWA's reliance upon the categorical exclusions listed in an earlier version of its regulations in approving a highway safety improvement project. According to the court, "the more specific examples of categorical exclusions listed in the regulations, rather than a party's or our own notions of substantiality", should govern when determining whether a categorically excluded project is properly considered not to have significant environmental impacts. 756 F.2d at 1019. In so ruling, the court noted that, although the project had gone through five years of planning, required the expenditure of millions of dollars, and involved the second busiest highway in the county, these factors were not determinative of the availability of a categorical exclusion. *Id.* Rather, the primary question to be answered in connection with the highway project pertained not to its size and scope, but to whether it would have significant environmental impacts. The court further ruled that, where the record indicates an agency has considered certain impacts, the agency's determination on whether these impacts are significant merits deference. Although plaintiffs had submitted some evidence suggesting that the project could potentially result in the diversion of traffic from the highway to local streets, the court deferred to the FHWA's conclusion that such possible impacts were likely to be insubstantial. *Id.* at 1021.

In *Sierra Club v. Hassell,* 636 F.2d 1095 (5th Cir.1981), the former Fifth Circuit upheld the decision not to prepare an EIS for the replacement of a bridge that had been destroyed by a hurricane. At issue was the FHWA's reliance on an earlier, analogous version of its regulations classifying highway reconstruction and repair projects as "non-major action" that were deemed exempt from the preparation of an EIS (a category of action reasonably analogous to the categorical exclusions recognized under the present regulations). In approving the FHWA's determination that the action was non-major, the court relied upon the fact that the record contained "extensive interagency discussion of environmental matters before the decision to rebuild the bridge was reached." *Id.* at 1098. The new bridge utilized an improved design, changing from a drawbridge to a fixed, high arch to permit the passage of vessels. The court held this change was not a sufficient alteration of the status quo as to merit preparation of an EIS, given that the new bridge was to use essentially the same alignment as the original bridge, was to remain two lanes, and was to be only slightly wider. *Id.* at 1099. Finally, the court noted that the size of the project requiring the expenditure of $30 million and construction over a period of two years did not alter its conclusion. *Id. City of Alexandria* and *Hassell* are instructive on the categorical exclusion issue presented here. In those cases, the ultimate question was not the scale or cost of the projects, but whether they would

have significant impacts on the environment.

With this regulatory framework and case law interpreting that framework in mind, the Court concludes that the FHWA's contemporaneous and extensive documentation amply reflects its consideration of whether a categorical exclusion applied to its approval of the Road Safety Improvements and its conclusion that it did. Moreover, the Court concludes that the FHWA's application of a categorical exclusion as compliance with NEPA is not arbitrary and capricious. These improvements, by definition and in the spirit of the regulations, fall within the types of actions specifically enumerated under 23 C.F.R. § 771.117(d)(1), (2) and (3)—namely, highway modernization activities, such as road resurfacing, restoration, rehabilitation, and reconstruction improvements; shoulder and auxiliary lane additions; and highway safety improvements, which do not induce increased traffic. Based on its past experience with these types of improvements, the FHWA determined that this portion of the 2LSP was the proper subject of a documented categorical exclusion. Specifically, the FHWA found "that roadway reconstruction projects that do not increase capacity, but provide safety improvements and replace bridges, such as the bridge over the C–111 canal, are normally categorically excluded from detailed NEPA study. Such is the case with the Two Plus design for this US–1 project."

The FHWA's decision is also supported by the more general requirements of 23 C.F.R. § 771.117(a). The FHWA's use of a categorical exclusion is appropriate given the agency's documented determination that the Road Safety Improvements will not add any general purpose travel lanes and involve only minimal roadway widen-

ing for safety and not capacity improvements, that these improvements will not have significant growth or travel impacts,[7] that the improvements will not induce significant impacts on planned growth or land use or have significant impacts on travel patterns, that they will be entirely within the existing right-of-way, thus, not causing the relocation of significant numbers of people, and that an original Project purpose, accommodation of growth in the Florida Keys, was eliminated by downsizing it from the original four lanes to two lanes. It is noteworthy that this downsizing and other ameliorative modifications of the Project occurred only after many years of extensive public comment, multi-agency analysis and litigation in direct response to concerns that the Project would have significant impacts on the environment.

In support of their claim that the FHWA failed to fairly address the 2LSP's true environmental impact, Plaintiffs suggest that the 2LSP is essentially an environmentally endangering wolf in sheep's clothing. In this regard, Plaintiffs have proffered the proposition that the "shoulders" to be constructed along the roadway are not truly shoulders and that the FDOT really intends for them to be converted into travel lanes in the near future, thereby substantially increasing traffic carrying capacity. Thus, argue Plaintiffs, the true purpose and effect of the 2LSP is to induce growth in the Florida Keys while escaping the requisite environmental "hard look." The Court cannot accept Plaintiffs' proposition. First, Plaintiffs offer no record evidence to support their proposition. Therefore, it is mere speculation. Second, the Administrative Record, rather than supporting Plaintiffs' proposition, clearly establishes that the shoulders are not in-

---

**7.** The Project's lack of significant cumulative and secondary impacts, including its lack of growth inducing impacts, is discussed more fully below in connection with the Bridge Replacement Project.

tended as, nor can they be used as, travel lanes of a heavily traveled highway. For example, the FHWA's approval of the 2LSP is specifically conditioned on it being limited to, and used only as, a two-lane travel highway, except for emergency use of the shoulder on the northbound side. In addition, the engineering and construction of the shoulders preclude their use as heavily traveled traffic lanes. This is clearly demonstrated in the drawing of the typical highway section which shows that the shoulders' structural foundations are significantly thinner, less substantial and narrower than the travel lanes' foundations. Moreover, even if the Court were to accept Plaintiffs' speculative proposition that the shoulders will someday be converted to full travel use, such a change would require its own, new environmental "hard look"—a matter properly left to another day.

In summary, the Court concludes that, in view of the end result of the extensive, ongoing NEPA review of this highway project, that is, the scaled down Two Lane Safety Project, the FHWA was not arbitrary and capricious in determining that the Road Safety Improvements would not have: (1) significant natural, cultural, recreational, historic, or other resource impacts; (2) significant air, noise, or water quality impacts; or (3) any additional significant environmental impacts, either individually or cumulatively, and a categorical exclusion was, therefore, appropriate. This conclusion is further buttressed by the significant environmental mitigation and new environment improving measures incorporated into those improvements.

Comparing the facts in *City of Alexandria* and *Hassell* with the facts presented here lends further support to the Court's conclusion that the FHWA's use of the categorical exclusion to approve the Road Safety Improvements was reasonable and certainly not arbitrary and capricious. For example, the proposed Road Safety Improvements appear to have a lesser impact than the improvements subject to the exclusion in *City of Alexandria.* The improvements in *City of Alexandria* were projected to potentially divert traffic from the highway system to the local streets, while the Road Safety Improvements will be entirely within the existing right-of-way and are projected to maintain the same traffic flow as was in place prior to construction. In addition, the Road Safety Improvements are no more environmentally intrusive than those upheld in *Hassell* in that the Road Safety Improvements are limited to design changes that are likely to have little impact on the environment (other than the beneficial effects associated with the mitigation and new environment improving features). As before completion of the 2LSP, this segment of US–1 will be limited to a two-lane roadway, but now with the addition of safety features which are the minimum needed to fulfill the safety goals. As with the improvements in *City of Alexandria* and *Hassell,* although the Road Safety Improvements are significant in cost and scale, the size of the project is not determinative of the applicability of a categorical exclusion given that the FHWA has reviewed the relevant factors and determined the proposed action is without significant environmental impacts. As the FHWA observed in its approval, "While costly, this relatively minor safety project is like the examples contemplated in 40 CFR § 1508.4 and 23 CFR § 771.117(a)-(d)." [8] Although extensive environmental review is not required by

---

**8.** The FWHA's determination of no significant environmental impacts is also supported by the separate EA prepared by the Corps in connection with its issuance of a CWA Section 404 Permit for the Project and the Corps' "finding of no significant impact" in that document, which is discussed below.

the regulations for categorically excluded actions, the court in *Hassell* looked favorably upon the interagency consultation and public comment that occurred in the month following the destruction of the original bridge. By comparison, the years of extensive environmental review and public comment on this Project, resulting in significant downsizing and mitigation measures, far exceed the review that the court found commendable in *Hassell* and, more importantly, what is required by NEPA. The fact that this Project has been subject to extensive environmental review resulting in significant reductions designed to mitigate its environmental effects, firmly supports the FHWA's use of the categorical exclusion to approve the Road Safety Improvements.

At the conclusion of the trial, the Plaintiffs requested and were granted an opportunity to provide additional case law in support of their contention that the FHWA improperly relied on a categorical exclusion to approve the Road Safety Improvements. The Plaintiffs responded with a single case, *West v. Secretary of the Department of Transportation, et al.*, 206 F.3d 920 (9th Cir.2000). The Court has carefully analyzed that decision, which reviewed the FHWA's use of a categorical exclusion to approve a two-stage fully directional highway interchange construction project built on a reclaimed landfill. The interchange was an integral part of a comprehensive plan designed, in part, to accommodate increased traffic demands generated by existing and anticipated growth in the area. While the majority in *West* held that use of the categorical exclusion in that case was not in compliance with NEPA, the facts in that case are materially distinguishable from those presented here. First, and foremost, unlike this case, the interchange improvement involved in *West* was not listed among the categories of actions specifically approved in the FHWA's regulations as appropriate

for categorical exclusions. The most analogous listed category that would potentially support the FHWA's decision to use a categorical exclusion for the highway interchange project, and the category advocated by the FHWA, was "Approvals for changes in access control," per 23 C.F.R. § 771.117(d)(7). Because this category was not further defined in the regulations, the legislative history or case law, the majority sought guidance by comparing the characteristics of the subject project with the characteristics of the non-exclusive list of actions identified in the regulations as appropriate for categorical exclusions. The majority concluded that the characteristics of the listed actions "strongly suggested" that a documented categorical exclusion was not appropriate for the highway interchange construction project. 206 F.3d at 928. In doing so, the majority noted that examples of highway projects for which categorical exclusions were potentially available included:

> *modernization of a highway by* resurfacing, restoration, rehabilitation, reconstruction, *adding shoulders, or adding auxiliary lanes*, highway safety or traffic operations improvements projects including the installation of ramp metering control devices and lighting, bridge rehabilitation, reconstruction or replacement ... and other similar activities. *See* 23 C.F.R. § 771.117(d).

*Id.* (emphasis added) (internal quotations omitted).

Unlike the project in *West*, here the Road Safety Improvements consist of actions which are identified by the regulations as properly subject to a categorical exclusion—road reconstruction improvements, shoulders, and auxiliary lane additions. In approving the 2LSP, the FHWA specifically pointed out that:

> While costly, this relatively minor safety project is like the examples contemplat-

ed in 40 C.F.R. § 1508.4 and 23 C.F.R. § 771.117(a)-(d) which allows us to reach this final agency decision. The FHWA environmental regulations consider safety improvements such as shoulders for emergency use and bridge replacements and attendant environmental mitigation to be generally within the Categorical Exclusion classification of 23 C.F.R. Part 771, § 771.117(a)-(d).

Another material difference between the cases is that in *West* a stated primary goal of the highway interchange project was "to accommodate the traffic demands generated by existing growth and sizeable growth forecast for the area." *Id.* at 922. This goal is not one of the 2LSP's goals. As has been extensively documented in the Administrative Record, the goal of accommodating growth, one of the goals of the four-lane version, was eliminated from the reduced Two Lane Safety version of the Project. The Reevaluation concluded that there is no reasonably foreseeable causal relationship between the reduced 2LSP and adverse growth related impacts. This is supported by a comprehensive growth analysis documented in the Reevaluation. Because the *West* facts are so materially different, the Court does not find it instructive on the issue of whether the FHWA arbitrarily and capriciously determined that the Road Safety Improvements qualified for categorical exclusion.

██ Unlike the Road Safety Improvements, the Bridge Replacement Project was approved by the FHWA pursuant to the FEIS and the Reevaluation. However, Plaintiffs challenge the sufficiency of these documents and the FHWA's reliance on them as not being in compliance with NEPA. Again, the Court's review of the FHWA's challenged action is governed by the "arbitrary and capricious" standard. *See Skinner,* 903 F.2d at 1538. Moreover, the Eleventh Circuit has indicated that the review is to be relatively straightforward

and limited. The courts shall "require only the statutory minima and will undertake their review with a recognition that Congress did not mandate perfection." *Id.* at 1540. Review of NEPA claims is limited to procedural compliance with NEPA rather than the substance of the decision. As recognized in another NEPA case involving the Florida Keys, "[t]he merits of the [agency] proposal per se are not before the Court. Nor may this Judge call into question any reasonable agency methodologies used in arriving at its conclusion. Rather, the Court's review is limited to ensuring that the process that produced the result complies with NEPA." *Protect Key West, Inc. v. Cheney,* 795 F.Supp. 1552, 1559 (S.D.Fla.1992).

██ Principal among Plaintiffs' NEPA complaints is the assertion that the FHWA should have prepared a supplement to the FEIS before approving the 2LSP. Specifically, Plaintiffs argue that the FHWA violated NEPA and the CEQ regulations by refusing to prepare a supplemental EIS ("SEIS") in light of the changes to the Project after it was approved under the 1992 FEIS and of the new circumstances developed after that approval. Defendants counter that an SEIS is not required and the Reevaluation is sufficient for approval of the Bridge Replacement Project given the environmentally ameliorative nature of the changes resulting from the downsized 2LSP. It is well settled in the Eleventh Circuit that an SEIS is warranted only where "the agency 'makes substantial changes in the proposed action that are relevant to environmental concerns,' or if there are 'significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.'" *Sierra Club v. United States Army Corps of Eng'rs,* 295 F.3d at 1215 (quoting 40 C.F.R. § 1502.9(c)(1)). In order to require an SEIS, new circum-

stances must present "a *seriously* different picture of the environmental impact of the proposed project from what was previously envisioned." *Sierra Club v. Froehlke*, 816 F.2d 205, 210 (5th Cir.1987) (emphasis original). This is so because requiring supplementation with every project change or every new piece of information—regardless of its environmental significance—would "task agencies with a sisyphean feat of forever starting over in their environmental evaluations, regardless of the usefulness of such efforts." *Price Road Neighborhood Ass'n, Inc. v. United States Dep't of Transp.*, 113 F.3d 1505, 1510 (9th Cir.1997). *See also Marsh v. Oregon Natural Res. Council*, 490 U.S. at 373, 109 S.Ct. 1851 ("[A]n agency need not supplement an EIS every time new information comes to light after the EIS is finalized. To require otherwise would render agency decisionmaking intractable, always awaiting updated information only to find the new information outdated by the time a decision is made.") (footnote omitted).

FHWA regulations also allow, and other courts have specifically approved, the use of a reevaluation to determine whether project changes have sufficient environmental impacts to merit the production of a supplemental study. *See* 23 C.F.R. § 771.129. *See also Price Road*, 113 F.3d at 1510 ("[W]hen faced with a project change, the FHWA may conduct a reevaluation to determine the significance of the new design's environmental impacts and the continuing validity of its initial EA. A supplemental EA is not automatically required under the regulations, but rather its necessity is dependent upon the findings and conclusions reached by the FHWA through its reevaluation process.").

The FDOT prepared the Reevaluation in 2003 in order to evaluate its downsized Two Lane Safety Project. The FHWA reviewed the Reevaluation in reaching its

determination that supplementation is not required for the Bridge Replacement Project. The FHWA carefully and adequately considered the Reevaluation, the reduction in the size of the bridge and any new, pertinent information regarding the redesigned bridge in reaching its reasonable determination that the reduction in the bridge's size and the new information offered do not present "a seriously different picture of the environmental impact of the proposed project from what was previously envisioned."

In order to resolve whether the FHWA's determination was arbitrary and capricious, the Court has carefully reviewed the Reevaluation together with the FHWA's approval documents and other pertinent portions of the record. In summary, the Court concludes the FHWA's determination to be a reasonable one, fully supported by an appropriately developed Administrative Record. In reaching this conclusion, the Court finds that Plaintiffs have not met their burden of demonstrating in the Administrative Record that there have been substantial environmental impacting changes in the currently designed Jewfish Creek Bridge. The Court observed that the currently proposed design has the same footprint as the originally approved bridge and the same vertical and horizontal clearances. The only difference between the two is that the new bridge's deck is now smaller and no longer split into physically separate lanes, which difference is irrelevant to environmental impact. As reasonably found by the FDOT, and as amply supported by the record, "Structurally, the Jewfish Creek Bridge, as currently proposed, is essentially the same as the concept in the original EIS. The environmental impacts are similar or reduced . . . ." Consistent with this finding, the Reevaluation documented that, in light of the downsizing of the Project and the environmental improvements in-

corporated into it, a supplement to the SEIS was likely not warranted for the proposed bridge and roadway improvements. "[I]t does not appear that construction of a smaller project in essentially the same location, with the same or greater mitigation and environmental enhancements, should warrant a SEIS." Based on these considerations, the FHWA decided that the new bridge design had no significant impacts that were not known and scrutinized in the 1992 FEIS. The FHWA's decision was understandable given that the downsizing to the overall 2LSP was in response to environmental concerns voiced in connection with the four and three-lane versions of the Project. *See Sierra Club v. United States Army Corps of Eng'rs*, 295 F.3d at 1221 (holding that a supplemental EIS was not required for a highway realignment project where changes to the original project were instituted to minimize its environmental impacts). *See also South Trenton Residents Against 29 v. Federal Highway Admin.*, 176 F.3d 658 (3rd Cir.1999) (approving the FHWA's decision not to supplement an EIS for a six-lane highway project where the FHWA had subsequently completed a reevaluation for a smaller, four-lane version of the project).

Plaintiffs also argue that various post-FEIS studies and plans regarding the Florida Keys constitute "new information" requiring the preparation of a supplement to the FEIS. As discussed above, a supplemental EIS is required only in response to new information where the information is "relevant to environmental concerns and bearing on the proposed action or its impacts...." *Sierra Club v. United States Army Corps of Eng'rs*, 295 F.3d at 1215, *citing* 40 C.F.R. § 1502.9(c)(1). In other words, the new information must both (1) relate to the environment, and (2) have direct relevance to the proposed action or its impacts. The various types of studies and new information offered by Plaintiffs can be grouped into three categories. First, Plaintiffs rely upon several environmental improvement studies and plans, ranging from the 1996 Florida Keys National Marine Management Plan (concerning restoration of historic freshwater flows) to the 2000 Comprehensive Everglades Restoration Plan (concerning restoration and maintenance of Everglades ecosystem).[9] Plaintiffs' reliance upon these studies is misplaced, as the information contained in them is not of the type that would require additional environmental analysis. Although these studies do relate to the environment, the Plaintiffs have failed to establish that they bear upon any significant environmental impacts caused by the Bridge Replacement Project.

NEPA requires the FHWA to examine only the environmental impacts from the Bridge Replacement Project itself. It does not impose an affirmative obligation upon the FHWA to study and undertake mitigation measures to improve pre-existing environmental conditions. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351–353, 109 S.Ct. 1835, 104 L.Ed.2d

---

9. Plaintiffs also cite to the not yet completed Florida Bay/Florida Keys Feasibility Study currently being produced by the Corps and SFWMD (studying modifications necessary to restore water quality and ecological conditions of the Florida Bay). Because this study does not relate to the Project's impacts and is not yet completed, it is not discussed extensively herein. Postponement of the Project while waiting for the completion of ever-pending studies that do not relate to the environmental impacts projected to be caused by the Bridge Replacement Project is not required. As discussed above, the courts have repeatedly instructed that every new piece of information or pending piece of information should not be used to forestall proposed projects indefinitely. *See, e.g., Marsh*, 490 U.S. at 373, 109 S.Ct. 1851.

351 (1989). Nevertheless, the record reflects that the FHWA and other involved agencies did, in fact, incorporate many ameliorative features into the Bridge Replacement Project, which were designed to improve tidal circulation and water flows and otherwise improve the area environment. The most obvious example is the removal of the Lake Surprise Causeway and its replacement with a low-level bridge. After extensive consultation with other agencies regarding the 2000 Comprehensive Everglades Restoration Plan, this change was designed specifically to restore historic water flows. It is noteworthy that the decision to remove the causeway was made in direct response to requests from representatives of the Florida Keys National Marine Sanctuary. Thus, the FHWA and the other involved agencies have clearly considered these studies designing and approving the Project. Their actions in doing so are certainly not arbitrary and capricious.

The second category of new information upon which Plaintiffs rely is the 2001 Florida Keys Hurricane Evacuation Study commissioned by the FDOT. Again, this study does not relate to the environmental effects of the Bridge Replacement Project, and, therefore, does not require supplementation of the FEIS. Moreover, given that the Bridge Replacement Project and the Road Safety Improvements have added a median barrier and a sufficient shoulder in the northbound lane to allow it to be temporarily converted to two lanes in times of emergency, it appears that the new bridge is consistent with the goal of assisting emergency evacuation.

The third category of new information offered by Plaintiffs relates to growth related impacts on the Florida Keys. Plaintiffs' argument relies, in part, upon the 2002 Florida Keys Carrying Capacity Study. Plaintiffs also argue that the Reevaluation improperly relied on the alleg-

edly erroneous 1996 findings concerning carrying capacity and growth impacts that the administrative judge made in approving the issuance of a state water quality permit (the "1996 Findings"). The Court finds that it was not inappropriate to consider the 1996 Findings in the Reevaluation. To the contrary, the record reflects that the 1996 Findings were the result of an exhaustive investigation and hearing regarding carrying capacity and growth impacts in the Florida Keys. Plaintiffs have not shown that these findings are unreliable. Moreover, Plaintiffs overlook the fact that the Two Lane Safety Project has deliberately removed as one of its goals an increase in roadway capacity and that the existing two-lane bridge will simply be replaced by a newer, safer two-lane bridge. It was not arbitrary and capricious to conclude that this is not the type of action reasonably expected to cause, directly or indirectly, significant population growth in the Florida Keys.

In any event, the record reflects that the studies to which Plaintiffs refer were fairly considered in the Reevaluation. Indeed, the Reevaluation includes a comprehensive and thorough analysis of the possible growth related impacts from the Project. The Reevaluation also includes discussion of the Carrying Capacity Study, and a thorough assessment of the continuing viability of the 1996 Findings, in view of post 1996 events. Based on this review, the Reevaluation reasonably concluded, consistent with the 1996 Findings, that there is no reasonably foreseeable causal relationship between the 2LSP and adverse growth related impacts, and that the project as a whole will not act as an impetus to further construction. As stated by the Reevaluation, "Development changes are occurring and continuing future growth is expected, with or without the project." This is not an unreasonable proposition. *See Sierra Club v. Hassell*, 636 F.2d at

1099 (finding appellants' contention that the replacement of a drawbridge with a high-level, fixed bridge "will result in heavier traffic to the island and lead to increased development is speculative as it relates to a change in environment"). Accordingly, the Court concludes that the FHWA did not act arbitrarily and capriciously in relying upon the Reevaluation in approving the Bridge Replacement Project rather than supplementing the FEIS.

As an alternative challenge, Plaintiffs contend that even if the FHWA was not required to supplement the FEIS, its evaluation was fatally flawed because the FEIS and the Reevaluation, on which the FHWA relied, fail to consider the cumulative and secondary impacts of the Bridge Replacement Project. With respect to the Bridge Replacement Project, Plaintiffs specifically contend that these studies' evaluation of cumulative impacts is inadequate because they fail to properly evaluate the growth-inducing effects of the 2LSP and its impacts on the carrying capacity of the Florida Keys. Plaintiffs also assert that the impacts from increased navigation into Jewfish Creek and Lake Surprise due to removal of impediments to watercraft access into these areas have not been not adequately considered. Finally, Plaintiffs contend that the FEIS does not adequately consider impacts from the closure of two unauthorized public boat ramps.[10]

Plaintiffs are correct that NEPA requires acting agencies to consider the cumulative impacts of related proposed federal actions. The CEQ regulations define cumulative impacts as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably fore-

seeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7. However, only cumulative impacts from projects that are "reasonably foreseeable" and "collectively significant" must be considered. *See* 40 C.F.R. § 1508.7. *See also Headwaters, Inc. v. Bureau of Land Mgmt.*, 914 F.2d 1174, 1182 (9th Cir.1990) (holding evaluation of "purely hypothetical cumulative impacts" unnecessary under NEPA). Obviously, there must be reasonable perimeters around what may be considered cumulative and secondary impacts. The Court concludes that the FHWA has adequately evaluated the potential cumulative effects and impacts of the Bridge Replacement Project consistent with the foregoing standards.

As discussed above, the Reevaluation reasonably concludes that the 2LSP, much less the Bridge Replacement Project, will not be the direct or indirect cause of future growth in the Florida Keys. Moreover, the FHWA's approval of the 2LSP is specifically conditioned upon the FDOT continuing "to operate the roadway and bridge portions of this project as a two-lane facility except in emergency events." In view of the extensive record before it, the Court cannot accept the Plaintiffs' speculative contention that the Bridge Replacement Project, which simply replaces a two-lane drawbridge with a new, safer and higher two-lane fixed bridge, will cause a significant growth in the Florida Keys. As the court in *Sierra Club v. Hassell* said,

Under these principles, it appears that the new bridge does not significantly alter the status quo. The bridge, though of an improved design, is essentially on the same alignment as the pre-

---

10. These two public boat ramps are described as "unauthorized" in the Administrative Record. Plaintiffs suggest that they are authorized boat ramps, but the Administrative Rec-

ord does not support Plaintiffs' suggestion. Regardless of whether the boat ramps are authorized, the Court's conclusion would not change.

vious two-lane bridge and is also only two lane [*sic*]. It is slightly wider, in conformity with present federal standards. Its only significant difference is that, unlike the old bridge, it does not have a drawbridge but instead contains a high arch to permit the passage of vessels. Appellants' evidence that the absence of a drawbridge will result in heavier traffic to the island and lead to increased development is speculative as it relates to a change in environment. 636 F.2d at 1099.

Plaintiffs also argue that increased boat traffic into the Intracoastal Waterway will significantly increase due to the elimination of delays associated with the existing drawbridge. However, the Reevaluation suggests that change in the status quo after the construction of the bridge is not expected to be significant. As discussed more thoroughly below in connection with the CWA claim against the Corps, record comments submitted in connection with the Bridge Replacement Project indicate that there is likely not to be a significant increase in the number of craft entering Jewfish Creek due to depth limits in the Intracoastal Waterway south of the creek. Large boats already have access to Jewfish Creek through the raising of the drawbridge and will continue to have that same access after the completion of the Project. The only change will be less delay, an improvement in the quality of the same boating activity, with less pollution and fuel consumption resulting from idling automobile and marine engines. Thus, the Court does not accept Plaintiffs' speculative contention that replacement of the drawbridge is likely to produce significant adverse environmental impacts in the area.

Plaintiffs also contend that the FEIS does not adequately assess the impacts from possible increases in jet ski and small boat traffic into the eastern half of Lake Surprise as a result of the causeway re-

moval. This contention is not supported by the Administrative Record. Moreover, the record reflects that there will be numerous measures in place which will limit any potential impacts upon wildlife and the environment due to increased boater access into Lake Surprise. These measures include a 100–foot "no access" buffer zone along the lake's eastern shoreline from March 1 to October 1 to protect crocodile nesting activities, an idle speed only/no wake zone east of US–1, signs providing notice of the restrictions, an active enforcement plan, and a plan for monitoring the effectiveness of the enforcement efforts. The FHWA did not assume, nor should the Court, that boaters will disobey these restrictions to an environmentally significant degree, or that enforcement authorities will allow such disobedience. *See Bicycle Trails Council v. Babbitt*, 82 F.3d 1445, 1457 (9th Cir.1996) (an agency may properly assume that the public will adhere to such restrictions on access in assessing the environmental impacts from its proposed action). In any event, it is clear that these possible environmental impacts have been appropriately considered and deemed insignificant in full compliance with NEPA.

In taking a seemingly contradictory position regarding the removal of the two boat ramps, Plaintiffs first argue that appropriate environmental analysis has not been completed regarding the closure of the two ramps and its possible effect on recreational opportunities in the Everglades—that is, too few boaters using these recreational areas. Plaintiffs next contend that the closure of the two ramps might force boaters to use other boating access points and thereby cause significant environmental effects in other recreational areas—that is, too many boaters using those other recreational areas. Irrespective of this apparent contradiction, the Court deems Plaintiffs' concerns about the closure of the two boat ramps to be too

vague and speculative to merit stopping the 2LSP. Indeed, the court in *Bicycle Trails* rejected a similar argument as overly speculative. 82 F.3d at 1457 (noting the argument that the closing of certain bicycle trails "might force bicyclists to ride in other areas, thereby compromising the nature of those areas" bordered on sheer speculation). Moreover, the environmental documentation upon which the FHWA relied in approving the 2LSP actually considered these boat ramp closures and reasonably concluded that any resulting impacts would be insignificant. The FHWA's conclusion stemmed largely from the finding that alternative boat ramps were likely to be provided and the existing ramps are unauthorized. Finally, it is noteworthy that the boat ramps providing access into Everglades National Park were closed upon the recommendation of park officials and are projected to lessen the number of boaters and impacts in Northeastern Florida Bay. The Court concludes that the FHWA's determination in this regard was not arbitrary and capricious, particularly given that the ramp closures are a minor feature of the Two Lane Safety Project.

■ A variation on Plaintiffs' cumulative effects theme is the contention that the Project, and specifically the Bridge Replacement Project, has been improperly segmented from other projects or actions in order to limit the scope of the FEIS and the Reevaluation's environmental impact evaluation. The FHWA has promulgated regulations concerning environmental analysis of roadway systems "[i]n order to ensure meaningful evaluation of alternatives and to avoid commitments to transportation improvements before they are fully evaluated...." 23 C.F.R. § 771.111(f). These regulations and the related judicial interpretations require a stand-alone project to: (1) connect logical termini and be of sufficient length to address environmental matters on a broad

scope; (2) have independent utility or independent significance; and (3) not restrict consideration of alternatives for other reasonably foreseeable transportation improvements. *See PEACH*, 87 F.3d at 1247. The "independent utility" factor is the most important. 87 F.3d at 1247. Moreover, in determining whether these criteria are met, a central question is whether the project "will serve a significant purpose even if a second related project is not built.... Only when a given project effectively commits decisionmakers to a future course of action will this form of linkage argue strongly for joint environmental evaluation." *Coalition on Sensible Transp., Inc. v. Dole*, 826 F.2d 60, 69 (D.C.Cir.1987). In turn, the question of whether a decision-maker is committed to a future course of action will largely turn upon whether the project irretrievably commits more public funding to other, future projects. *See Taxpayers Watchdog, Inc. v. Stanley*, 819 F.2d 294, 298–300 (D.C.Cir.1987). Finally, courts have held that an agency's determination of the scope of a project is entitled to deference, *see Northwest*, 56 F.3d at 1067, and the regulations direct that an EIS's analysis of cumulative actions is required to cover only proposed actions rather than actions that are only a theoretical possibility. *See* 40 C.F.R. § 1508.25(a)(2).

With the foregoing criteria in mind, the Court must determine whether the FHWA has impermissibly "segmented" the Bridge Replacement Project. To begin, the Bridge Replacement Project has independent utility, because it is designed to replace an obsolete bridge structure that is in need of replacement regardless of whether the Road Safety Improvements are also made. The record establishes that the existing bridge is more than 60 years old, in need of frequent repairs, subject to frequent mechanical failures, and considered "functionally obsolete," not to

mention that standing alone it constitutes an identifiable major safety problem. Moreover, the Plaintiffs have not established that the completion of the Bridge Replacement Project will irretrievably commit the FHWA to the funding of other future projects identified in the Miller Study, which Plaintiffs contend should have been considered in the evaluation. Finally, the administrative record reflects that at least a portion of the projects recommended by the Miller Study are only in the planning stages and, therefore, do not qualify as proposed action.

Although, as indicated above, the Road Safety Improvements ultimately were approved pursuant to a categorical exclusion rather than by reliance upon the FEIS and Reevaluation, the extensive analysis of the Road Safety Improvements in these documents is sufficient for satisfying the cumulative impacts analysis required for the improved bridge. These documents do not, however, attempt to assess the full cumulative impacts from all future highway improvements that may eventually be completed to improve evacuation times out of the Florida Keys. Regardless, Plaintiffs have failed to establish that such a requirement falls within the NEPA requirements relating to cumulative impacts. *See PEACH*, 87 F.3d at 1247 ("[J]ust because the project at issue connects existing highways does not mean that it must be considered as part of a larger highway project; all roads must begin and end somewhere."). Any attempt to assess the cumulative impacts from such future projects would be pure speculation and is not required. *See* 40 CFR § 1508.25(a)(2). Accordingly, for all of the foregoing reasons, the Court concludes that the FHWA did not improperly segment the Bridge Replacement Project. *See Village of Los Ranchos de Albuquerque v. Barnhart*, 906 F.2d 1477, 1482–4 (10th Cir.1990) (holding that a project for the construction of two highway bridges was properly deemed in-

dependent of the connecting highway interchange project because the bridges had logical termini, substantial independent utility, did not ·foreclose alternatives for future projects, and did not commit funds for any related projects). *See also Conservation Law Found. v. FHWA*, 24 F.3d 1465, 1472 (1st Cir.1994) ("[T]wo bridges on either side of an island appear to be perfectly logical termini. . . ."). Notwithstanding the foregoing, the record reflects that the FDOT and the FHWA recognized the reality that the Bridge Replacement Project was not designed in a vacuum, but rather is considered an "indivisible part" of the Road Safety Improvements.

▪ Plaintiffs' final NEPA challenge is that the FEIS and Reevaluation do not consider sufficient alternatives to the 2LSP or its bridge replacement component. NEPA requires an EIS to include a detailed statement of alternatives to the proposed action. 42 U.S.C. § 4332(2)(C)(iii). As the Eleventh Circuit has observed, however, "[t]his procedural requirement is bounded ·by 'some notion of feasibility,' and consideration need be given· only to reasonable, non-speculative alternatives." *Skinner*, 903 F.2d at 1541 (quoting *Piedmont Heights Civic Club. Inc. v. Moreland*, 637 F.2d 430, 436 (5th Cir.1981)). Therefore, an agency's EIS is adequate under NEPA "if the treatment of alternatives, when judged against a rule of reason, is sufficient to permit a reasoned choice among the various options." *Skinner*, 903 F.2d at 1541 (quotation omitted). In addition, an agency need not consider alternatives that are not reasonably related to the purposes of the action, or that are infeasible, ineffective, or inconsistent with basic policy objectives that the agency is called upon to implement. *See Piedmont Heights*, 637 F.2d at 435–36. *See also Headwaters, Inc.*, 914 F.2d at 1180. Finally, the definition of a project's pur-

poses is a matter left in the first instance to the judgment of the agency. *See City of Angoon v. Hodel,* 803 F.2d 1016, 1021 (9th Cir.1986). *Accord City of Alexandria, Va. v. Slater,* 198 F.3d 862, 867 (D.C.Cir. 1999).

Again, the record reflects, and the Court concludes, that the FHWA adequately considered viable alternatives to the Bridge Replacement Project. The FEIS devotes an entire section to the discussion of alternatives. The FEIS specifically considered several conceptual alternatives for the Bridge Replacement Project—a no action alternative, a tunnel, a new higher bascule bridge, and a high-level fixed bridge. The FEIS focused upon a comparison between a new higher bascule bridge and a high-level fixed bridge based upon such factors as construction costs; socioeconomic, engineering, and environmental effects; accident reduction; vehicular and vessel delays; and fuel consumption estimates. Ultimately, the high-level fixed bridge was chosen as the preferred alternative, largely on the justifications that unimpeded motor vehicle traffic flow would reduce the number of rear-end collisions, improve the flow of marine traffic, and actually provide a substantial cost savings over the life of the project.

These justifications are rational, rather than arbitrary and capricious. Moreover, despite Plaintiffs' argument to the contrary, these justifications appear at least as valid today as when the FEIS was completed in 1992. The reduction in the bridge design from four lanes to two does not undermine the original justifications for the originally designed high-level fixed bridge. Plaintiffs argue that the FHWA should have reconsidered other two-lane alternatives to the Jewfish Creek Bridge in addition to the option that was chosen. This argument overlooks the fact that the environmentally significant decision made

in connection with the Bridge Replacement Project pertained to the type of replacement bridge that the project would utilize, not the number of lanes built into the structure. The relevant environmental considerations remain materially the same now as in 1992. As discussed above, the courts generally do not require supplementation and a new alternatives analysis where project changes simply reduce the scale of the previously approved project rather than changing the configuration and location of project features. *See South Trenton,* 176 F.3d 658 (holding that no supplementation was required for highway project reduced from six to four lanes); *Dubois v. United States Dep't. of Agric.,* 102 F.3d 1273, 1292 (1st Cir.1996) (holding that new alternatives analysis was required where final approved ski area project "entail[ed] a different configuration of activities and locations, not merely a reduced version of a previously-considered alternative"). This is a rational, practical standard, faithful to NEPA's goals, and applicable here, given that the currently proposed two-lane bridge will be located within the existing right-of-way and within the footprint of the previously approved four-lane version. Thus, the FHWA fairly observed that "structurally, the Jewfish Creek Bridge, as currently proposed, is essentially the same as the concept in the original EIS. The environmental impacts are similar or reduced, as discussed within the Reevaluation, upon the same alignment," and that "the Replacement Bridge differs from that studied in 1992 only in respect to the [smaller] deck which carries the traffic. The footprint of the bridge, piers and footings, are the same now as those studied in the 1992 FEIS and ROD and within the existing right-of-way of the State."

The FHWA's decision not to undertake a new alternatives analysis to study the same options examined in the FEIS for

two rather than four lanes is not arbitrary and capricious. The Court agrees with the Defendants that a new analysis would be an undue expenditure of time and resources made unnecessary in view of the rule that simple reductions in project size do not require supplementation of an EIS. The Court concludes that the FHWA fairly considered an adequate range of alternatives to the Bridge Replacement Project, including a new bascule bridge, a high-level fixed bridge, a tunnel, and a no action alternative, and did not act arbitrarily and capriciously in that regard. Accordingly, for all the foregoing reasons, the Court concludes that the Plaintiffs have failed in their burden of proof on all NEPA claims against the FHWA.

**B. The FDTA claims against the FHWA.**

 In addition to their NEPA claims against the FHWA, Plaintiffs allege that the FHWA has violated Section 4(f) of the FDTA, claiming that the Project adversely impacts on Everglades National Park. As discussed above, Section 4(f) provides that the Secretary of Transportation may approve a transportation project requiring the use of public park lands or lands of an historic site of national, state, or local significance only if (1) there is no prudent and feasible alternative to using that land, and (2) the program or project includes all possible planning to minimize harm resulting from the use. *See* 49 U.S.C. § 303(c). Use of such lands may be both actual or constructive. In determining constructive use, mere proximity to a protected resource is not enough. Rather, the project's impacts must be "so severe that the protected activities, features, or attributes that qualify a resource for protection under section 4(f) are substantially impaired." 23 C.F.R. § 771.135(p)(2). "Substantial impairment" occurs only when the protected activities, features, or attributes of the resource are substantially diminish-

ed. 23 C.F.R. § 771.135(p)(2). Under this standard, *de minimis* impacts clearly do not constitute constructive uses. *See Coalition on Sensible Transp.*, 826 F.2d at 63.

Plaintiffs have the burden to demonstrate that the Everglades National Park will be constructively used by the Project. *See Sierra Club v. Lynn*, 502 F.2d 43, 52 (5th Cir.1974). After considering Plaintiffs' FDTA claim in view of the above legal standard and the Administrative Record, the Court concludes that Plaintiffs have failed to meet their burden as to either an actual or constructive use of the Everglades National Park. The Plaintiffs have failed to demonstrate that any protected lands or resources will be substantially impaired as a result of the 2LSP. In reaching its conclusion, the Court rejects Plaintiffs' contention that the closure of two public boat ramps, establishing wildlife perimeter fencing, removal of the Lake Surprise Causeway, or any other action contemplated by the 2LSP constitutes a use of protected property as contemplated by FDTA. Rather than substantially diminishing the value of Everglades National Park's wildlife habitat or detracting from its park-like setting as contemplated by the regulations, *see* 23 C.F.R. § 771.135(p)(4)(ii), (v), these improvements are compatible with park objectives. Thus, the Court affirms the determination in the Reevaluation that, to the extent the Project shall have any effects on Section 4(f) lands, they shall be environmentally positive ones. Accordingly, Plaintiffs' FDTA claim against the FHWA fails.

**C. The CWA Claims Against the Corps.**

 Plaintiffs also challenge the Corps' issuance to the FDOT of a permit to discharge Project materials pursuant to Section 404 of the CWA. The Corps' decision to issue such a permit may be set

aside only if that decision was arbitrary and capricious on the basis of the record before the Corps at the time the decision was made. *PEACH,* 87 F.3d at 1246–47. Judicial review is particularly deferential "where the agency decision under review includes a 'balancing' process like the 'public interest' review provided for by the Corps' regulations." *Envtl. Coalition,* 831 F.2d at 986. The regulations that govern the Corps' issuance of a Section 404 Permit require the Corps to consider whether there are "practicable" alternatives to a proposed discharge of dredged or fill material that would have less adverse impact on the aquatic ecosystem. *See* 40 C.F.R. § 230.10(a). "An alternative is practicable if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." 40 C.F.R. § 230.10(a)(2). In evaluating practicable alternatives, "the Corps has a duty to take into account the objectives of the applicant's project." *La. Wildlife Fed'n, Inc. v. York,* 761 F.2d 1044, 1048 (5th Cir.1985). The burden of showing a lack of practicable alternatives lies with the project applicant—in this case, the FDOT—not with the Corps. *Utahns for Better Transp. v. United States Dep't of Transp.,* 305 F.3d 1152, 1186 (10th Cir. 2002), *modified on reh'g on other grounds,* 319 F.3d 1207 (10th Cir.2003). *See also Alliance for Legal Action v. United States Army Corps of Eng'rs,* 314 F.Supp.2d 534, 543 (M.D.N.C.2004) (noting that in reviewing Corps' permitting decision, "the court's inquiry is not whether the Corps has clearly demonstrated a lack of practicable alternatives, but whether its decision that [the applicant] had done so was a clear error of judgment").

The record establishes that the FDOT engaged in a lengthy examination of different highway configurations, including various four-lane and three-lane roadway designs, before arriving at the final 2LSP. In fact, the Corps was instrumental in bringing about fundamental changes in the Project design that substantially reduced adverse impacts on the aquatic environment. The FDOT previously applied for a Section 404 permit to authorize discharges in connection with the original four-lane roadway described in the FEIS. The Corps' concerns that the four-lane project "would result in significant degradation and adverse cumulative impacts" prompted the FDOT to withdraw its permit application in 1997. At the Corps' request, further Project modifications occurred even after the FDOT submitted its permit application for the 2LSP. Specifically, revisions to an intersection allowed the FDOT to reduce impacts to wetlands by an additional three acres. Thus, the history of the Project shows that the FDOT made a series of alterations in the roadway design in order to minimize impacts to the aquatic environment. In 2004, during the public comment process on the issuance of the Section 404 Permit, the Corps, at the Plaintiffs' suggestion, asked the FDOT to consider still another alternative: a highway median design known as the "Cape Cod Alternative." Upon review, the FDOT concluded that the Cape Cod Alternative did not fulfill the safety objectives of the Project because that alternative is intended to be an interim, not permanent, safety improvement and could potentially launch fast moving vehicles into oncoming traffic. The Administrative Record reflects that the Corps reasonably relied on the determination of the FDOT—an agency with particular expertise in the area of transportation safety—that the Cape Cod Alternative did not fulfill the safety objectives of the Project. Based on the FDOT's review of this alternative, the Corps concluded that the Cape Cod Alternative was not a practicable alternative to the Project because "the safety standards and needs identified for the US–1 South improvement are clearly not

met by the 'Cape Cod Alternative.'" That conclusion is not arbitrary and capricious.

As reflected in the FEIS, the FDOT also conducted a detailed analysis of alternative crossing concepts for replacing the bascule bridge at Jewfish Creek. The Corps' reliance on information contained in the 1992 FEIS regarding alternative designs for the Jewfish Creek Bridge is reasonable, particularly in light of the fact that the changes to the bridge design resulted in a scaled down version of the original design. Moreover, the Corps considered the FDOT Reevaluation, as well as information obtained through the Corps' permitting process, to ensure that its reliance on the 1992 FEIS was still appropriate. The Corps' decision to rely on relevant information presented in the FEIS, as supplemented by the Reevaluation and other information obtained through the permitting process, is reasonable and consistent with the principle that "the need to reinitiate an alternatives analysis is diminished where the project modifications have lowered the potential for adverse environmental impact...." *Northwest Envtl. Def. Ctr. v. Wood,* 947 F.Supp. 1371, 1379 (D.Or.1996) (holding that Corps acted reasonably in not requiring new alternatives analysis after phase of project was eliminated from consideration). *See also Hoosier Envtl. Council, Inc. v. United States Army Corps of Eng'rs,* 105 F.Supp.2d 953, 989–90 (S.D.Ind.2000) (rejecting claim that Corps failed to consider alternatives where "[t]hese accusations overlook the fact that the project was modified extensively ... to reduce impacts in the floodplain"). *Cf. Airport Communities Coalition v. Graves,* 280 F.Supp.2d 1207, 1219 (W.D.Wash.2003) ("An original EIS ... is no longer adequate as a source of information necessary to a rational decision on the relative risks and benefits of a proposed action *not* because it fails to include new information or any evaluation of it, but because the new information presents a seriously different picture of the likely environmental harms stemming from the proposed action.") (emphasis original) (quotations omitted).

The scope of the Corps' analysis of alternatives reasonably reflects that the down-sized two-lane design emerged from a process that was specifically geared toward, and according to the Administrative Record, successful in, minimizing impacts to the sensitive aquatic ecosystem of the Florida Keys. Given the FDOT's reasoned consideration and evaluation of numerous alternative highway and bridge designs, before and after the issuance of the FEIS, the Corps' determination that "[t]he project as proposed with minimization efforts and mitigation ... is the least damaging practicable alternative" is not arbitrary and capricious.

■ Plaintiffs also challenge the validity of the Corps' assessment of the Project's impact on surrounding wetlands. The Corps' assessment of impacts to wetlands is obviously a technical matter that is within that agency's expertise and for which it is entitled to considerable deference by the Court. *See Inland Empire Pub. Lands Council v. Schultz,* 992 F.2d 977, 981 (9th Cir.1993) ("We defer to agency expertise on questions of methodology unless the agency has completely failed to address some factor...."); *Holy Cross Wilderness Fund v. Madigan,* 960 F.2d 1515, 1527 (10th Cir.1992) (according deference to Corps where "expert views on the highly technical question of how best to determine the possible impacts of the Project on wetlands ... have differed").

Plaintiffs assert that the Corps failed to accurately assess wetland impacts in three specific areas: (1) tidal flushing; (2) contaminated storm water runoff from roads and bridges; and (3) seagrass destruction or motorboat propellor scarring. Further, Plaintiffs assert that the alleged flaws in the impact analysis render the mitigation

features of the Project inadequate. Plaintiffs also assert that the Corps improperly segmented its analysis of impacts. These assertions have been considered and rejected by the Court based upon its review of the Administrative Record.

Plaintiffs' assertion that the Corps erred in its impact assessment is belied by the comprehensive and reasoned discussion in the record of the procedures used in characterizing the nature and extent of impacts to the various types of wetland in the Project area. The Project calls for the FDOT to restore tidal flushing, which allows natural tidal flow and circulation to occur in aquatic areas that have been artificially impounded. Tidal flow and circulation are necessary to sustain productive seagrass beds. The FDOT will accomplish tidal flushing in Lake Surprise by removing the Lake Surprise Causeway. In addition, the FDOT will offset the majority of the Project's impacts to seagrass beds by restoring flushing to impounded lagoons at the Boca Chica Mitigation Site. The Corps' document reflects that prior tidal flushing projects have successfully restored and enhanced seagrass wetlands in the Florida Keys National Marine Sanctuary. Specifically, the record shows that the NMFS evaluated the potential for success in establishing viable seagrass beds by restoring tidal flushing at the Boca Chica lagoon and concluded: "Based on the results obtained in the western lagoon (approximately 62 acres of seagrass, primarily *Halodule wrightii*, recolonized the lagoon after it was restored to tidal influence), the potential for success in the eastern lagoon is considered excellent." Although construction work required to restore tidal flushing would necessitate impacts to 0.3 acres of wetlands, this impact was adequately addressed by the Corps and the FDOT during the permitting process. The FDOT explained that the 0.3 acres of unavoidable wetland impacts would be offset at a 6:1 acreage ratio by the creation of 1.8 acres

of wetlands. Because tidal flushing is a beneficial impact to the aquatic environment, and all adverse impacts associated with tidal flushing were adequately addressed in the record, Plaintiffs' criticism of the sufficiency of the Corps' evaluation of tidal flushing issues is misplaced.

Plaintiffs also assert that the Corps failed to consider potential adverse effects on wetlands of contaminated stormwater runoff from roads and bridges. The record is to the contrary, indicating that the Corps considered and adequately dealt with that potential problem because the water runoff situation will be substantially improved upon completion of the Project. This is because the Project will provide a stormwater treatment system along the entire Project corridor where currently none exists. The Corps performed a qualitative and quantitative analysis of the stormwater treatment system and concluded that the Project would lead to cleaner water in the Project corridor: "Ecosystem functions will be improved by providing water quality treatment to storm water runoff before it enters the surrounding wetland habitat and adjacent surface waters." In fact, the Corps determined that the proposed stormwater treatment system for the roadway exceeded the minimum standard under applicable requirements. The Court cannot accept Plaintiffs' claim that the Corps failed to consider the impact of stormwater runoff because the record shows that the FDOT and the Corps conducted a detailed and reasoned evaluation of stormwater management issues.

With regard to impacts to seagrass, the record shows that the Corps characterized and assessed the impacts to each wetland type, including the impact to seagrasses, by applying either the Estuarine Wetland Rapid Assessment Procedure or the alternative acreage methodology. Plaintiffs

have not shown that the Corps' impact assessment is arbitrary and capricious. In evaluating the Project's impact to seagrasses, the Corps reasonably adhered to the sequencing preference established in the governing regulations: (1) avoidance, (2) minimization, and (3) compensatory mitigation. *See* 33 C.F.R. § 320.4(r). *See also Fund for Animals, Inc. v. Rice*, 85 F.3d 535, 543 (11th Cir.1996). With regard to minimizing incidents of propellor scarring, which is a potential secondary impact to seagrass beds traceable to recreational watercraft use, the Corps reasonably determined that these concerns could be adequately addressed through a variety of institutional controls—including designation of the area as a Wildlife Management Zone, placement of appropriate signs, and implementation of a coordinated enforcement program—designed to regulate recreational watercraft traffic in the eastern half of Lake Surprise.

The Court finds that the Corps is entitled to rely on, and did reasonably rely on, the considered judgment of other agencies with particular expertise in managing sensitive marine environments, including managing the appropriate methods to minimize watercraft impacts to previously inaccessible portions of Lake Surprise. *See Marsh,* 490 U.S. at 378, 109 S.Ct. 1851 ("When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive."). It appears from the record that the scope of the Corps' consideration of the Project's foreseeable direct, indirect, temporary, and permanent impacts to seagrass wetlands is not arbitrary and capricious.

Plaintiffs argue that the Corps failed to analyze the potential for the Project's fixed 65–foot bridge to induce a greater volume of boat traffic through Jewfish Creek and produce adverse secondary impacts on seagrass beds resulting from that change in boat traffic. The Court rejects the argument, as speculative, for the reasons more fully discussed above, and because Plaintiffs have not demonstrated that the Project will alter the depth of the channel at Jewfish Creek or otherwise significantly increase boat traffic. The Corps' decision not to further analyze the speculative impact of any potential change in boat traffic that might flow from the replacement of a bascule bridge with a high-level fixed bridge is rational and entitled to deference in light of the evidence in the record.

The Court also finds no basis in the record for Plaintiffs' claim that the Corps impermissibly segmented its evaluation of the impacts of the Project. This is because the Project will improve public safety along an undisputably dangerous and identified 20.6 mile stretch of highway. Thus, the Project has independent utility from a public safety standpoint and merits consideration as a stand-alone project. *See PEACH,* 87 F.3d at 1247.

Similarly, for the reasons discussed more fully above, the Court finds no merit to Plaintiffs' dispute with the Corps' conclusion that the Project is not expected to result in induced growth and development in the Florida Keys. Moreover, as the Corps noted in its Statement of Findings regarding the 2LSP: "When future road improvements are made within the Keys, there will still be just two lanes entering and exiting the Keys." Moreover, with regard to any potential secondary impact of induced growth resulting from the down-sized 2LSP, the Corps reasonably concluded that growth management measures being implemented by Monroe County would adequately restrict growth. The Corps' decision to defer to local agencies with expertise in growth and planning issues is consistent with the CWA's implementing

regulations. *See* 33 C.F.R. § 320.4(j)(2) ("The primary responsibility for determining zoning and land use matters rests with state, local and tribal governments."). While Plaintiffs, or even the Court, may not agree with the Corps' judgment, that is not a valid basis for concluding that the Corps' permitting decision is arbitrary and capricious.

The Plaintiffs also fail to adequately support their challenge to the Corps' determination of mitigation requirements in connection with the issuance of the Section 404 Permit. The Section 404 Permit's comprehensive requirements of mitigation, monitoring and the development of a contingency mitigation plan adequately address the Project's anticipated impacts, including impacts to seagrass beds. The Corps determined that expected impacts to 103.9 acres of wetlands are mitigated by restoration, creation, and enhancement of 434.48 acres of wetlands reflects mitigation ratios that vary from 1:1 to 3:1 for various wetland types. The permit also requires the FDOT to perform 1.00 additional acre of mitigation at the Boca Chica Mitigation Site in order to compensate for unanticipated impacts to seagrass that may occur during Project construction. By requiring the FDOT to restore and enhance a larger area of wetlands than will be impacted by the Project, the Section 404 Permit fairly compensates for the foreseeable loss of wetlands. Given the Corps' extensive and reasoned consideration of the wetlands losses and how best to mitigate them, the Corps' decision to issue the permit subject to the substantial mitigation conditions is not arbitrary and capricious.

Plaintiffs also challenge the Corps' decision to approve the use of the Boca Chica Mitigation Site for mitigation of seagrass impacts because it is not located near the Project. The Corps' decision to approve the use of off-site mitigation for impacts to seagrasses is consistent with the CWA regulations that authorize the use of off-site mitigation. 33 C.F.R. §§ 320.4(r)(1), 325.4(a)(3). *See also* Mitigation Memorandum of Agreement between Corps and EPA § II.C.3 ("If onsite compensatory mitigation is not practicable, off-site compensatory mitigation should be undertaken in the same geographic area if possible."). Moreover, the question of whether to use the Boca Chica Mitigation Site to offset wetland impacts associated with the Project was extensively addressed and adequately dealt with during the Corps' permitting process. Given the record evidence of the difficulty of identifying sufficiently large sites for seagrass mitigation in the Florida Keys, and in view of substantial evidence in the record establishing that this site is the best available site and that prior seagrass mitigation efforts there have been successful, it cannot be said that the Corps was arbitrary and capricious in approving the FDOT's decision to use the Boca Chica Mitigation Site. *See Airport Communities Coalition v. Graves,* 280 F.Supp.2d 1207, 1227–28 (W.D.Wash.2003) (finding that the Corps was not arbitrary or capricious in rejecting other mitigation areas on ground that "network of small and fragmentary mitigation sites would not adequately compensate for functional losses associated with [project]"). The Corps reasonably accounted for the distance between the Project site and the Boca Chica Mitigation Site by requiring the FDOT to mitigate for seagrass impacts on a 3:1 ratio. In other words, the FDOT is required to create 3 acres of seagrass wetlands at Boca Chica for every acre of impacted seagrass that is not accounted for by on-site mitigation. Additionally, on-site seagrass mitigation is being performed at a 2:1 ratio to compensate for the temporal lag between the time of impact and the time of mitigation. This ratio is still

a requirement in spite of the fact that a substantial portion of the required mitigation has already been successfully completed.

The Permit's detailed monitoring requirements for the construction and post-construction mitigation activities further support the Corps' conclusion that the Project satisfies the policy of "no net loss of wetland function, value and acreage." *See Sierra Club v. Slater*, 120 F.3d 623, 636 (6th Cir.1997) ("[I]t is not necessary to have a final, detailed mitigation plan prior to approval of a [Section] 404 Permit; instead, a permit conditioned on future implementation of a mitigation plan complies with the dictates of the Clean Water Act.") (citing *PEACH*, 87 F.3d 1242, 1248 (11th Cir.1996)). In addition, the permit's requirement that the FDOT prepare and implement a contingency mitigation plan if the seagrass mitigation program proves less successful than anticipated demonstrates that the Corps thoroughly considered and prudentially responded to concerns regarding the technical and problematic challenges inherent in seagrass mitigation. *See Greater Yellowstone Coalition v. Flowers*, 359 F.3d 1257, 1275 (10th Cir.2004) (upholding issuance of Section 404 Permit where Corps concluded that project would not have a significant impact on river "but adopted monitoring requirements in case its conclusion is wrong"). The Corps' determination of the mitigation required to be performed at the Boca Chica Mitigation Site to offset the Project's impacts to seagrasses comports with the applicable guidelines, because among other factors the seagrass mitigation plan requires a 3:1 replacement ratio for off-site mitigation, imposes detailed monitoring duties on the FDOT, and requires implementation of a contingency mitigation plan if necessary.

The Court finds reasonable the Corps' determination that on balance, this Project would result in no adverse environmental impact because all reasonably foreseeable wetland impacts were adequately addressed by the Corps' mitigation requirements, which requirements are enforceable conditions of the permit. *See Slater*, 120 F.3d at 635 (rejecting plaintiffs' attempt to establish adverse environmental impact by selectively focusing on temporary impacts only and "effects that would occur in the absence of a mitigation plan"). Moreover, the Court finds that the Corps' decision to issue the Section 404 Permit with numerous detailed conditions for mitigation reasonably reflected a careful and appropriate balancing of several relevant factors: the need for improving traffic safety along a dangerous stretch of highway, the environmental benefit of replacing the existing roadway with one that includes a stormwater management system that will enhance water quality and reduce erosion from uncontrolled stormwater runoff, the benefit of improving tidal flow, and the benefit to wildlife of adding protective fencing along the highway and creating safe wildlife crossings. Accordingly, the Court concludes that the Corps' decision to grant the Section 404 Permit is not arbitrary and capricious.

## D. The ESA Claims Against the FWS and the NMFS.

Plaintiffs' last claims allege that the Corps violated the ESA by relying on arbitrary, insufficient biological opinions from the FWS and the NMFS relating to endangered and threatened species. As discussed above, the ESA's goal is to protect the ecosystem on which endangered and threatened species depend. In order to achieve this goal, the ESA requires the action agency to consult with the FWS and/or the NMFS whenever a federal action may affect these listed species. This

consultation is in the form of a Biological Opinion, by which the FWS and/or the NMFS advise the action agency whether these listed species are impacted by the proposed action. In this case, the Corps obtained Biological Opinions from the FWS and the NMFS. The Plaintiffs challenge these opinions which opined that the 2LSP was not likely to adversely affect or jeopardize the listed species. The Corps relied on these two opinions in issuing the Section 404 Permit. Plaintiffs contend that these decisions were rendered without fully and adequately analyzing the potential impacts which the 2LSP may have on the listed species and their critical habitat and that the opinions that the species were not likely to be adversely affected are not adequately supported by the record. Specifically, for example, Plaintiffs argue that the FWS' opinion that the manatee would likely not be adversely impacted was premised on the unfounded conclusion that the 2LSP would not materially change marine traffic in the area. Plaintiffs also argue that the NMFS' opinion regarding the smalltooth sawfish was based, in part, on an unfounded conclusion that the fish's mobility was sufficient to protect it from potential harm.

The Corps' reliance on the challenged Biological Opinions is reviewed under the APA's arbitrary and capricious standard and is owed particular deference by the court. *Fund for Animals*, 85 F.3d at 541. *See also Sierra Club*, 295 F.3d at 1222–23 (upholding Corps' decision to rely upon "not likely to adversely affect" determination concerning alleged impacts from construction of Suncoast Parkway). The Corps is authorized to reasonably rely on such opinions in its permitting process. *Fund for Animals*, 85 F.3d at 548 ("[W]e hold that the Plaintiffs have failed to show that the Corps acted arbitrarily and capriciously by relying on these Opinions when consultation with the F.W.S. is exactly what is required by the relevant statutory scheme.").

To succeed in their claims challenging the FWS and the NMFS determinations, in light of the deferential standard of review, Plaintiffs must demonstrate that: 1) the FWS and the NMFS determinations themselves are arbitrary and capricious; and 2) the Corps reliance on these determinations was, likewise, arbitrary and capricious. *See Pyramid Lake Paiute Tribe v. United States Dep't of the Navy*, 898 F.2d 1410, 1415 (9th Cir.1990) (holding that acting agency's reliance on FWS biological opinion will satisfy obligation under ESA if the challenging party cannot point to "new information" that the FWS did not take into account). The Court concludes that the Plaintiffs fail to carry their burden in both regards.

First, Plaintiffs' contention that the FWS opinion and the Corps' reliance on that opinion were arbitrary and capricious because the FWS failed to take into consideration the 2LSP's impacts on marine traffic patterns is belied by the Administrative Record. The record confirms that the FWS was aware that the removal of the existing Lake Surprise Causeway will restore historic navigational and hydrologic connectivity between eastern and western Lake Surprise. As the Reevaluation reports: "Another proposed design change in the project will affect navigation in Lake Surprise.... Small boats and personal water craft will be able to pass back and forth under the low-level portion of the new Jewfish Creek/Lake Surprise Bridge after the Lake Surprise Causeway has been removed to an elevation of–2.0 feet NGVD." The FWS opinion reflects that in evaluating this removal and its potential adverse impacts on wildlife, the FWS observed that the operation of watercraft in both the eastern and western portion of Lake Surprise is already part of the existing "envi-

ronmental baseline." Further, the FWS noted that "[m]anatees are known to occur within Jewfish Creek and Lake Surprise, and powerboats are known to operate in these areas," but that the environmental baseline also incorporates existing speed zones and other manatee protection measures. The FWS pointed out that "Lake Surprise east of the existing causeway has been designated as 'no wake' by the Florida Keys National Marine Sanctuary," as is the zone within 100 feet of the new bridge over Jewfish Creek. The FWS opined that "the proposed project is not expected to change watercraft use patterns or increase watercraft traffic in the action area" and that boaters would be required to observe the "no wake" zones. In light of the FWS' experience with manatees and its knowledge of the environmental baseline of marine traffic and operating boating restrictions in the area, the FWS opined that removal of the Lake Surprise Causeway or indirect effects associated with the construction of the 2LSP would likely not adversely affect the manatees or their habitat. The Court concludes the FWS' opinion and the Corps' reliance on that opinion are not arbitrary and capricious.

With regard to the NMFS' determination of no likely adverse affect on listed species, Plaintiffs' expressed concern about increased boat traffic resulting from the Project is speculative, is rebutted by the record and does not undermine the NMFS' recorded evaluation of potential Project impacts in relation to the marine environmental baseline. Included in that evaluation is the NMFS' observation that "vessel traffic is restricted within the project area. A no-access buffer zone and an idle speed zone exists within the project area for manatees and the American crocodile." The NMFS also observed that the smalltooth sawfish's mobility would allow it to avoid potential harm from the Project. Moreover, irrespective of any planned modifications along US–1, the NMFS not-

ed that commercial and recreational catches of smalltooth sawfish are very rare, as detailed in the Federal Register notice listing the species as endangered. 68 Fed.Reg. 15,674, 15676 (April 1, 2003) (noting that there have been no commercial landings of smalltooth sawfish since 1978 and recreational catches of sawfish are "very rare"). Plaintiffs have not shown that the NMFS' observations are unreasonable.

In addition to the above considerations, the FWS and the NMFS also properly considered the beneficial results from Project mitigation in assessing the extent of any potential adverse affects on marine life and its habitat. *See Fund for Animals*, 85 F.3d at 545 (noting that challenged Corps permit, while facilitating development within species habitat, would otherwise further other conservation benefits through a mitigation plan that provided for creation, restoration, and enhancement of adjacent wetland areas); *Selkirk Conservation Alliance v. Forsgren*, 336 F.3d 944 (9th Cir.2003) (FWS properly relied upon mitigation in conservation agreement in arriving at a "no jeopardy" conclusion). While Plaintiffs do not address these environmentally positive factors in their analysis, the federal agencies did in reaching their opinions that the 2LSP would likely not adversely affect the listed species. Specifically, the NMFS, in its letter to the Corps, notes that while 33.7 acres of mangrove habitat will be lost as a result of the Project, 82 acres of mangrove habitat in the action area have been restored prior to the beginning of construction. It also noted that "an additional 5.2 acres of manatee foraging habitat will be created. Furthermore, the proposed causeway removal is expected to improve water quality in Lake Surprise and benefit the manatee by improving existing foraging habitat."

Where, as here, the agency's particular technical expertise is involved,

the court defers to the agency's expertise and discretion. *Baltimore Gas,* 462 U.S. at 103, 103 S.Ct. 2246. "When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Marsh,* 490 U.S. at 378, 109 S.Ct. 1851. While Plaintiffs and possibly others may disagree with the agencies' marine life experts' opinions regarding the 2LSP's impact on the listed species, or the relative benefits of its mitigation program and causeway removal, such disagreement is insufficient for the Court to declare that the FWS and the NMFS biological opinions, or the Corps' reliance on them, are arbitrary and capricious.

## CONCLUSION

For the reasons discussed above, the Court concludes that the Plaintiffs have failed to prove any of their claims against the Defendants. Therefore, the Plaintiffs' requests that the Court: (a) declare that the decisions of the Defendants FHWA, the Corps, the FWS and the NMFS re-

garding the approvals, licensing and other agency actions related to the Project are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law and violate NEPA; (b) enter a permanent injunction enjoining all Defendants from taking any action which in any way supports construction or development of the Project; and (3) grant any other relief in respect of the Project are **DE-NIED.**[11]

Accordingly, the Court will enter a final judgment against the Plaintiffs and in favor of all Defendants.

## *FINAL JUDGMENT*

Pursuant to the Order denying Plaintiffs' Request for a Preliminary Injunction and ruling for the Defendants on the merits, entered this date, it is hereby ORDERED that Plaintiffs shall take nothing by this action and that Defendants go hence without day. The Court reserves jurisdiction over appropriate motions for attorney fees and costs. The Clerk of the Court is directed to mark this case CLOSED and DENY all pending motions as moot.

---

11. In order to timely inform the parties of its decision prior to the April 4, 2005 Project construction start date, the Court, on April 1, 2005, orally announced its ruling on all of Plaintiffs' claims.

EXHIBIT "A"

## ROADWAY TYPICAL SECTION S.R. 5

## BRIDGE TYPICAL SECTION S.R. 5

JEWFISH CREEK BRIDGE / LAKE SURPRISE CAUSEWAY

| | US-1 SOUTH TYPICAL SECTIONS 2-LANE SAFETY PROJECT | FIGURE NO. 2 |

EXHIBIT "B"

TYPICAL SECTION S.R. 5
4-LANE ALTERNATIVE SELECTED DURING POLE PHASE

ALTERNATIVE 4C

TYPICAL SECTION S.R. 5
3-LANE ON A 4-LANE EMBANKMENT

PERMITTED 3 ON 4

TYPICAL SECTION S.R. 5
2 - LANE SAFETY PROJECT ALTERNATIVE

2LSP

US-1 SOUTH
TYPICAL SECTION REDUCTIONS

3